**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF PENNSYLVANIA**

**BERNARD G. JOHNSON, JR.,**              :

              **Plaintiff**              :          **CIVIL ACTION NO. 3:05-0342**

       **v.**              :                     **(CONABOY, D.J.)**
                                              **(MANNION, M.J.)**
**DOMINICK L. DEROSE, TED**        :
**BISHOP, KEN NOLTE, & JIM HILL,**
                                   :
       **Defendants**              :

## REPORT AND RECOMMENDATION

Before the court are the plaintiff's and defendant DeRose's, Bishop's, and Nolte's motions for summary judgment. The court will address both motions together in the interest of judicial economy. For the following reasons, the court recommends that the defendants' motion be granted, the plaintiff's motion be denied, and the plaintiff's complaint be dismissed as against the moving defendants.

## I.    Procedural History

The plaintiff, an inmate presently incarcerated at the Federal Correctional Institution at Allenwood, White Deer, Pennsylvania, commenced the instant action on February 17, 2006, by filing his complaint against defendants DeRose, warden of Dauphin County Prison ("DCP"), where the events giving rise to the complaint occurred, Bishop, a DCP lieutenant, Nolte, a DCP corrections officer, and Hill, a DCP corrections officer.  (Doc. No. 1.) In the complaint, the plaintiff alleges that defendant DeRose violated his

Eighth and Fourteenth Amendment rights by ordering him placed in a punishment cell for one week, with nothing but toilet paper, on false grounds, failing to investigate an incident for which the plaintiff was punished, and having two rings confiscated.  The plaintiff alleges that defendant Bishop violated his Fifth, Sixth, and Fourteenth Amendment rights by falsely finding him guilty of a disciplinary charge and sentencing him thereupon to seven months' confinement in the restrictive housing unit ("RHU") because the plaintiff would not reveal who was actually guilty of the disciplinary violation. Defendant Bishop is also accused of confiscating the plaintiff's rings.  The plaintiff alleges that defendant Nolte violated his constitutional rights by falsely issuing him a misconduct, which was caused when defendant Nolte endangered the plaintiff's life by opening all the cell doors in the protective custody, or "shakedown," housing unit and which led to seven months' confinement in the RHU.  Defendant Nolte is also accused of confiscating the plaintiff's rings.  Finally, the plaintiff alleges that defendant Hill violated his Eighth Amendment rights by assaulting and choking him while he was handcuffed to a cell door.  The plaintiff seeks compensatory and punitive damages and injunctive relief.  (Doc. No. 1.)

On April 13, 2005, the plaintiff amended his complaint.  (Doc. No. 27.) In the amended complaint, the plaintiff elaborates on the factual basis underlying his allegations.  He adds two defendants, both corrections officers accused of violating his First, Eighth, and Fourteenth Amendment rights.  He

2

also adds allegations concerning incidents that occurred after the filing of the original complaint.  The plaintiff summarizes his legal claims: the defendants violated his First Amendment rights by retaliating against him for filing the instant action; they violated his Fourth Amendment rights by conducting illegal and degrading cell and strip searches, during which they confiscated his property; they violated his Fifth Amendment rights as they did his Fourth Amendment rights; they violated his Eighth Amendment rights by conducting the degrading strip searches, assaulting him, falsely punishing him under cruel conditions, and confiscating his property; and, they violated his Fourteenth Amendment rights as they did his Eighth Amendment rights, as well as by punishing him by confining him to RHU and stealing his money without any misconduct hearing.  (Doc. No. 27.)

By way of response, the defendants moved for summary judgment on May 3, 2005.  (Doc. Nos. 31 & 34.)  On May 23, 2005, the plaintiff moved for summary judgment and filed a response to the defendants' motion and a brief in support of the response.  (Doc. Nos. 36, 37, & 38.)  He did not file a brief in support of his motion.  At the time they moved for summary judgment, the defendants were unaware of the plaintiff's amended complaint.  After being served with the amended complaint, the defendants submitted a new motion for summary judgment on June 23, 2005.  (Doc. Nos. 49, 50, & 51.)  The plaintiff, too, submitted a second motion for summary judgment on July 6, 2005.  (Doc. No. 52.)  He filed a brief in opposition to the defendants' second

3

motion, but did not submit a brief in support of his motion.  (Doc. No. 53.)

On December 29, 2005, the undersigned issued a report and recommendation recommending that the defendants' motions for summary judgment be granted and the plaintiff's motions for summary judgment be denied or, in the alternative, deemed withdrawn because of the plaintiff's failure to submit a supporting brief.  (Doc. No. 66.)  In a memorandum and order issued on April 11, 2006, the court adopted the report and recommendation in part and declined to adopt the report and recommendation in part.  (Doc. No. 70.)

The court deemed the plaintiff's motions withdrawn.  The court granted the defendants' motions in part and denied them in part.  It dismissed without prejudice the plaintiff's claims arising from events occurring after June 23, 2004, because of the plaintiff's failure to exhaust administrative remedies.  It ordered the case continued only as against defendants DeRose, Bishop, Nolte, and Hill, and only on four claims: the allegations of a Fourth Amendment violation from the strip searches in February 2004; the allegations that defendant Hill used excessive force in violation of the Eighth Amendment; the allegations of a Fourteenth Amendment violation from the conditions under which the plaintiff was confined from February 11, 2004, to February 18, 2004; and, the allegations of Fourteenth Amendment due process violations before June 23, 2004.  (Doc. No. 70.)  On May 11, 2006, pursuant to the court's memorandum and order, the defendants answered the

4

plaintiff's amended complaint.  (Doc. No. 81.)

On August 17, 2006, the plaintiff filed the motion for summary judgment under consideration here.  (Doc. No. 111.)  He subsequently submitted a supporting brief and a statement of undisputed material facts.  (Doc. Nos. 114 & 120.)  In the motion, the plaintiff raises two arguments.  First, he argues that he is entitled to summary judgment against defendant Bishop on his due process claim stemming from the misconduct hearing.  Second, he argues that he is entitled to summary judgment against defendant Bishop on his equal protection claims.  He contends that his equal protection claims were allowed to continue in the court's memorandum and order of April 11, 2006. The plaintiff does not raise any arguments against any other defendants or on any other grounds.  (Doc. No. 120.)

In response, the defendants contend that the memorandum and order specifically excluded the plaintiff's equal protection claim. They further contend that the plaintiff has failed to show a due process violation and the plaintiff's claim is barred by the favorable termination rule.  (Doc. No. 125.) The defendants also moved to strike parts of the plaintiff's statement of facts on the grounds that he included legal arguments and conclusions, as well as averments related to the matters excluded from the case by the April 11, 2006, order.  (Doc. No. 122.)  The court granted the motion to strike as unopposed.  (Doc. No. 139.)

On August 30, 2006, defendants DeRose, Bishop, and Nolte filed the

motion for summary judgment under consideration here, along with a statement of undisputed material facts, exhibits, and, subsequently, a supporting brief.  (Doc. Nos. 115, 116, 117, & 121.)  In their motion, the defendants argue that the plaintiff cannot establish any genuine issue of material fact concerning the strip search claim, the condition of confinement claim, or the due process claim.  They also argue that the plaintiff cannot seek injunctive relief or punitive damages under §1983.  On the strip search claim, the defendants contend that the plaintiff failed to exhaust his administrative remedies, defendant DeRose had no personal involvement in the searches, and the searches were reasonable under the circumstances. On the conditions of confinement claim, the defendants contend that the plaintiff failed to exhaust his administrative remedies, defendant DeRose had no personal involvement in the conditions, and the conditions did not violate the plaintiff's rights. On the due process claim arising out of defendant Nolte's actions, the defendants contend that defendant Nolte was not deliberately indifferent to a known or foreseeable risk of harm and the plaintiff was not actually injured by defendant Nolte's allowing the plaintiff and the other inmates in RHU to congregate during recreational time and that the misconducts issued by defendant Nolte were warranted under the circumstances.  On the due process claim arising out of defendant Bishop's actions, the defendants contend that the disciplinary lock-in sentences given to the plaintiff by defendant Bishop in the misconduct hearings do not

6

implicate a constitutional interest and the loss-of-good-time sentences were made in accordance with due process and supported by "some" evidence.  In addition, according to the defendants, the plaintiff cannot challenge the loss of good time under the favorable termination rule.  (Doc. No. 121.)

In response, the plaintiff raises several arguments.  First, he contends that the defendants are barred by the principles of collateral estoppel and res judicata on the basis of the court's April 11, 2006, order from seeking summary judgment concerning the plaintiff's alleged failure to exhaust administrative remedies, defendant DeRose's conduct, the strip search claim, and the conditions of confinement claim.  He argues that the court "already adjudicated" these claims and "clearly held . . . that the Defendants, as the movants in the previous summary judgment proceedings, did not meet their burden . . . ."  (Doc. No. 135 (emphasis in original).)  Second, he contends that the defendants' affidavits submitted in support of their motion must be stricken under Federal Rules of Evidence 602 and 802 and Federal Rule of Civil Procedure 56(e) because they "are not based on affiant personal knowledge and contain hearsay."  (Doc. No. 135.)  Third, the plaintiff contends that the defendants' evidence submitted in support of their motion "lack[s] sufficient indicia of reliability and trustworthiness and can not establish material fact and support defendants' motion for summary judgment."  (Doc. No. 135.)  Next, he contends that the defendants have not met their burden and genuine issues of material fact exist as to the strip search claim, the

7

conditions of confinement claim, and due process claims.  Finally, the plaintiff contends that he is entitled to injunctive relief because DCP inmates continue to be abused and he is entitled to punitive damages from the defendants at least in their individual capacities because they acted with an evil motive. (Doc. No. 135.)

Having been fully briefed, the motions are ripe for disposition, and the court now turns to a substantive analysis of the parties' claims.  However, it will not consider the plaintiff's equal protection arguments because the April 11 order excluded them from the case.  The plaintiff attempted in a "motion to substantiate & clarify his asserted equal protection claim" (Doc. No. 100) to reinsert them into the case, but the court denied the motion because of the April 11, 2006, order and the progressed state of the case (Doc. No. 106). Likewise, the court will not at this even more advanced stage of the litigation reverse itself.  The court will also not consider the defendants' argument that the plaintiff failed to exhaust administrative remedies because the April 11 order "conclude[d] that Plaintiff has exhausted his available administrative remedies regarding any claim made in a grievance submitted before June 23, 2004." (Doc. No. 70 at 33.)  Finally, the court will not address the defendants' favorable termination rule defense or argument concerning punitive and injunctive relief because it is unnecessary on the basis on the court's conclusions below.

8

## II.     Standard of Review

Summary judgment is appropriate when the pleadings and any supporting materials show that there are no material issues of fact to be resolved and the moving party is entitled to judgment as a matter of law.  FED. R. CIV. P. 56(c); see Turner v. Schering-Plough Corp., 901 F.2d 335, 340 (3d Cir. 1990).  Federal Rule of Civil Procedure 56(c) "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  Celotex Corp. v. Catrett, 477 U.S. 317 (1986).  Furthermore, "Rule 56(e) . . . requires the nonmoving party to go beyond the pleadings and by [its] own affidavits, or by depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial."  Id. at 324; Lujan v. National Wildlife Fed'n, 497 U.S. 871, 888 (1990); Pastore v. Bell Tel. Co. of Pennsylvania, 24 F.3d 508, 511 (3d Cir. 1994) (quoting Harter v. GAF Corp., 967 F.2d 846, 852 (3d Cir. 1992)).  The party moving for summary judgment bears the burden of showing the absence of a genuine issue of any material fact, but the nonmoving party must adduce more than a mere scintilla of evidence in its favor and cannot simply reassert factually unsupported allegations contained in the pleadings.  Celotex Corp., 477 U.S. at 323, 325; Anderson v. Liberty Lobby, Inc., 477 U.S. 248-52 (1986); Young  v. Quinlan, 960 F.2d 351, 357

9

(3d Cir. 1992).

To determine whether the nonmoving party has met its burden, the court must focus on both the genuineness and the materiality of the factual issues raised by the nonmovant. "[T]he mere existence of <u>some</u> alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no <u>genuine</u> issue of <u>material</u> fact." <u>Anderson</u>, 477 U.S. at 242, 247-48 (emphasis in original). A dispute is genuine if the evidence would allow a reasonable jury to return a verdict for the nonmoving party. <u>Anderson</u>, 477 U.S. at 250. A disputed fact is material when it could affect the outcome of the suit under the governing substantive law. <u>Anderson,</u> 477 U.S. at 248. If the court determines that "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" <u>Matsushita Elec. Indus. Co. v. Zenith Radio</u>, 475 U.S. 574, 587 (1986) (quoting <u>First Nat'l Bank of Arizona v. Cities Serv. Co.</u>, 391 U.S. 253, 289 (1968)). All inferences, however, "should be drawn in the light most favorable to the non-moving party, and where the non-moving party's evidence contradicts the movant's, then the non-movant's must be taken as true." <u>Pastore</u>, 24 F.3d at 512 (quoting <u>Big Apple BMW, Inc. v. BMW of N. America, Inc.</u>, 974 F.2d 1358, 1363 (3d Cir. 1992)).

## III.   Factual Background

With the standard for summary judgment in mind, the court has compiled from the parties' statements and counter-statements of facts (Doc. Nos. 114, 116, 124, & 133), in accordance with its prior orders, and, as necessary, the evidence on which they are based, the following pertinent factual background to the case.  Because the court confronts cross-motions for summary judgment, it accepts as undisputed and true any facts agreed upon by both the plaintiff and defendants or not controverted by the opposing party.  The court notes any factual disputes between the parties by presenting both parties' contentions. However, where it does so, the court does not represent that the party controverting the opposing party's statement has provided support for its denial of that statement.  Rather, the court is merely noting dispute regardless of whether the controversy is substantiated in the record. The court will address the issues of supporting evidence, as necessary, in the legal analyses.  In the analyses, the court has appropriately applied the standard for summary judgment in analyzing each party's contention.  Additionally, because defendant Hill is not moving for summary judgment, facts and allegations that are pertinent only to the case against him are not included here.

On January 6, 2004, the plaintiff, a Federal pretrial detainee, entered the DCP.  (Doc. Nos. 114 ¶ 3 & 116 ¶ 2.)  Because he feared that his life was endangered by a "huge vendetta" by several corrections officers, the plaintiff

was moved to the shakedown housing unit, which was a more secure protective custody area than the RHU. (Doc. Nos. 114 ¶¶ 4 & 6 & 116 ¶¶ 7-9.) There were six inmates in the shakedown unit, including the plaintiff.  The plaintiff did not like the other five inmates.  According to the plaintiff, they threatened him, but he did not fear them because of his Islamic beliefs and did not feel threatened because he "is rather versed in self-defense."  (Doc. No. 133 ¶ 11.)  But the plaintiff had no problems with the other inmates.  (Doc. Nos. 116 ¶¶ 10-12 & 133 ¶¶ 10-12.)  The shakedown inmates were housed in pairs in three cells that lined a corridor that was closed by a door on either end.  Neither door had a window through which the corrections officers could see into the shakedown unit.  At one end of the corridor, behind a locked door, was the DCP's property room, where inmates' property boxes were stored.  The guard station was beyond the property room.  (Doc. Nos. 116 ¶¶ 13-14 & 133 ¶ 13.)

The shakedown inmates received one hour of recreation time a day.  In February 2004, the DCP's practice, according to the defendants, or policy, according to the plaintiff, was to release one cell at a time.  (Doc. Nos. 114 ¶ 6 & 116 ¶16.)  However, on February 11, 2004, defendant Nolte simultaneously released all the shakedown inmates for recreation time.  (Doc. Nos. 114 ¶ 7& 116 ¶ 22.)  According to the defendants, although it was against DCP practice, defendant Nolte opened all the cells because the inmates requested it, which caused defendant Nolte to suspect that "they

were up to something." (Doc. No. 116 ¶ 24.) He "agreed to the request to ferret out their intentions." (Doc. No. 116 ¶ 24.) The plaintiff denies the defendants' proffered rationale and claims that defendant Nolte "negligently" released the inmates together "because he was lazy and to follow D.C.P. policy would have required more work and supervision." (Doc. No. 133 ¶ 24.) It is likely that this was the only time that defendant Nolte released the inmates together, though the record is unclear. (Doc. Nos. 116 ¶ 23 & 133 ¶ 23.) According to defendant Nolte, he had no reason to believe that the plaintiff was endangered by the inmates' being simultaneously released. (Doc. No. 116 ¶ 25.) According to the plaintiff, the very nature of the shakedown unit meant that there was danger, and defendant Nolte failed to investigate whether any inmate would be threatened by simultaneous release. (Doc. No. 133 ¶ 25.)

Defendant Nolte entered the corridor during the inmates' recreation time and observed two inmates, but not the plaintiff, in the ceiling area, above a light fixture. (Doc. Nos. 114 ¶ 8 & 116 ¶¶ 28 & 29.) Defendant Nolte secured the inmates in the cells. (Doc. Nos. 114 ¶ 8 & 116 ¶ 31.) Upon searching the ceiling cavity, defendant Nolte and other officers discovered twenty-two inmate property boxes, which had apparently been stolen from the adjacent property room, as well as several weapons or potential weapons. (Doc. Nos. 114 ¶ 10 & 116 ¶ 32.) The six inmates, including the plaintiff, denied knowing of or being involved in the theft of the inmate property boxes and their

concealment in the ceiling cavity.  (Doc. No. 116 ¶ 36.)  Defendant Nolte believed that all six inmates had "equal access" to the cavity and its contents because all the cells were open and all the inmates "had clear views" of the ceiling cavity."  (Doc. No. 116 ¶¶ 30 & 35.)  The plaintiff rejects defendant Nolte's belief, averring that the two inmates caught in the ceiling considered the boxes their property and prevented other inmates from accessing them and that his view of the ceiling area was obstructed.  (Doc. Nos. 114 ¶ 40 & 133 ¶¶ 30 & 35.)  Defendant Nolte had no reason not to suspect that the plaintiff was involved with the theft or had been in the ceiling cavity prior to February 11, 2004.[1]  (Doc. No. 116 ¶ 37.)  Consequently, the six inmates were placed on "strip cell status," during which the inmates were strip searched, the cells were searched, and the inmates' property was removed for verification of ownership.  (Doc. Nos.  114 ¶¶ 10 & 19 & 116 ¶¶ 33-34.)

---

[1]The defendants state, "Plaintiff admits that Nolte had no reason to believe that Plaintiff had not been tampering with or climbing around in the ceiling."  (Doc. No. 116 ¶ 37.)  The plaintiff denies the statement and contends that he "never stated that Defendant Nolte had 'no' reason to believe" that he was not involved in the incident.  (Doc. No. 133 ¶ 37.)  The defendants base their statement on the plaintiff's deposition:

> Q.     Did he [defendant Nolte] have any reason to know that you had not been up in the ceiling previously when the other inmates were up there putting all of the boxes up there?
> A.     I can't say that he did.

(Doc. No. 117 ex. U p. 53.)  While it is technically correct that the plaintiff never made a statement in the form presented by the defendants, it is quibbling to interpret the plaintiff's answer as narrowly as he does.  Indeed, the court notes that the plaintiff frequently denies the defendants' statements of fact not on the basis of clear factual inaccuracy, but rather because he takes issue with the defendants' manner of restating what he said in his deposition.

The defendants claim that Lieutenant Hohney ordered the strip cell status, but the plaintiff claims that corrections officers told him that defendant DeRose ordered the strip cell status.  (Doc. Nos.  114 ¶ 19, 116 ¶ 34, & 133 ¶ 34.) Various contraband was discovered in the cells.  The corrections officers continued to discover contraband during the three shifts on February 12, 2004, though the plaintiff denies this. (Doc. Nos.  114 ¶ 16, 116 ¶¶ 33 & 50-53, & 133 ¶¶ 33 & 50-54.)  During the initial search on February 11, a ring, hidden in the plaintiff's shoe tongue, was seized from him as contraband. Defendant Nolte believed that the plaintiff may have stolen the ring from an inmate property box, although the plaintiff denies this. In any case, the ring was contraband.  (Doc. Nos.  114 ¶¶ 10, 12, 14-15 & 116 ¶¶ 40-44.)  On February 12, according to the defendants, they discovered razor blades in the plaintiff's possession.  The plaintiff claims that he was framed because he and his cell had been searched thrice earlier that day, and on February 11, without any contraband being discovered.  (Doc. Nos. 114 ¶¶ 36 & 37, 116 ¶ 53, & 133 ¶ 53.)  He also argues that he never possessed any stolen property or contraband and any such items found in his cell belonged to his cellmate. (Doc. No. 114 ¶ 47.)

Strip search status was continued through February 18, 2004.  During that time, the inmates and their cells were searched each shift, thrice daily. The inmates were exteriorly strip searched.  Because the inmates did not receive recreational time while on strip cell status, the plaintiff contends that

15

the continued strip searches at a time when the inmates had no access to contraband were undertaken solely to humiliate and degrade the inmates, especially himself in violation of Islamic tenets.  The defendants contend that the inmates in fact had access to contraband, as shown by the discoveries on February 12, as well as additional discoveries on other inmates on February 13, 14, 15, 17, and 18, therefore warranting the strip searches.  According to the defendants, the inmates had access to contraband when they received their meals and medication and when they, including the plaintiff, were taken to the medical unit; the plaintiff denies the defendants' claims because medical visits are always supervised.  (Doc. Nos. 114 ¶¶ 19, 44-45, & 60, 116 ¶¶ 54, 60-69, 87, & 90, 124 ¶ 44, & 133 ¶¶ 60-69, 87, & 90.)

The inmates' cells were also stripped of various materials.  According to the defendants, pursuant to DCP policy, "inmates on strip cell status are entitled to have in their possession a mattress, blanket, uniform, undergarments, socks, and shoes" and are provided with toilet paper and personal hygiene items on request.  (Doc. Nos. 116 ¶¶ 78 & 95 & 124 ¶ 35.)  Furthermore, according to the defendants, the inmates' original mattresses were seized on February 11 and replaced with new mattresses the next morning; new uniforms were also issued on February 12.  (Doc. No. 116 ¶¶ 82 & 89.)  They further state that, under the DCP's strip cell policy, inmates may receive mail for a short period of time to read it, but that the mail is then stored with the inmate's writing materials and personal belongings; an inmate

may not receive books or magazines. Inmates are also not allowed possession of personal hygiene items except upon request and for immediate use. (Doc. No. 124 ¶ 35.)

According to the plaintiff, the corrections officers seized everything, including mattresses, blankets, clothing, and personal hygiene items, and did not provide access to mail, writing materials, the law library, or showers. (Doc. Nos. 114 ¶¶ 19 & 35 & 133 ¶ 78.)  He denies that the defendants replaced the seized mattresses or issued new uniforms. (Doc. No. 133 ¶¶ 82 & 89.)   Furthermore, according to the plaintiff, the temperature in the shakedown unit was kept very cold, which was exacerbated by the plaintiff's lack of clothing and bedding and led to his developing a cold.  (Doc. No. 133 ¶¶ 97, 99-100, & 108.)  The plaintiff also complains that his sink and toilet were leaky.  (Doc. No. 133 ¶¶ 101-104.)  Together, the conditions of his confinement led, according to the plaintiff, to psychological injury. (Doc. No. 133 ¶ 109.)

The defendants agree that the plaintiff did not receive a shower because inmates in the shakedown unit, who are allowed showers every three days, take their showers during recreational time, which, as noted above, was discontinued during the strip cell status.  The defendants also note that there is no evidence of an injury from the lack of a shower and that the plaintiff had previously refused scheduled showers.  (Doc. Nos. 116 ¶¶ 91-94 & 124 ¶ 32.) They further note, based on the maintenance logs, that no corrections officer

noticed any maintenance problem, such as a leaking sink or toilet, in the plaintiff's cell.  (Doc. Nos. 116 ¶¶ 101-04 & 124 ¶ 35.)  In addition, they contend that the temperature in the shakedown unit ranged from 73 to 83 degrees and that there is no evidence that the plaintiff suffered from a cold because he never sought medical treatment.  (Doc. Nos. 116 ¶¶ 98-100 & 108 & 124 ¶ 35.)  They contend that the plaintiff also never sought treatment for the psychological injury, which the plaintiff concedes.  (Doc. Nos. 116 ¶ 109 & 133 ¶ 109.)

In addition, the plaintiff complains that the shakedown unit was "over-run with vermin," which the defendants deny on the basis of bimonthly visits by an exterminator.  (Doc. Nos. 114 ¶ 34, 116 ¶¶ 105-06, & 124 ¶ 34.)  The plaintiff further complains that the defendants did not feed him for thirty-six hours, from sometime after 4:00 pm on February 11 until 4:10 am on February 13; the defendants deny the plaintiff's claim and argue that the cell block logs and Behavioral Adjustment Unit reports show that the plaintiff received his meals. (Doc. Nos. 114 ¶ 30, 116 ¶ 90, & 124 ¶ 30.)

The defendants claim that Deputy Warden Carroll ordered the continuation of strip cell status and defendant DeRose did not learn of it until after the order was given; the plaintiff contends that several corrections officers told him that defendant DeRose ordered the continuation. (Doc. Nos. 114 ¶¶ 19 & 46, 116 ¶¶ 54-56 & 79-81, 124 ¶ 46, & 133 ¶¶ 55 & 79-81.) According to the defendants, Deputy Warden Carroll ordered the strip cell

status because she feared that the inmates might have modified or tampered with the shakedown unit so as to conceal additional contraband; she also wanted to ensure the inmates' and the corrections officers' safety and DCP's security.  (Doc. No. 116 ¶¶ 57-59.)  The plaintiff denies the averments and contends instead that the strip cell status was meant to "degrade, dehumanize and punish the Shakedown inmates."  (Doc. No. 133 ¶¶ 57-59.)

According to the defendants, on February 13, a new inmate was moved into the plaintiff's cell.  The next day, the new inmate told defendant Bishop that the plaintiff and other inmates planned to escape by climbing into the ceiling cavity and to the roof.  (Doc. No. 116 ¶¶ 72-74.)  The plaintiff denies that he planned an escape.  (Doc. No. 133 ¶¶ 73-74.)  The defendants contend that, on the basis of this information, they continued strip cell status until the inmates could be securely and safely relocated.  (Doc. No. 116 ¶¶ 75-76.)  The plaintiff denies this.  (Doc. No. 133 ¶¶ 75-76.)

On the basis of the incident concerning the ceiling cavity, defendant Nolte charged the six inmates, including the plaintiff, with ten violations: theft; possession of contraband; destroying, altering, tampering with, or damaging the county's or another's property; disruptive behavior or interference with the security of or orderly running of the prison; refusing to obey an oral or written order; presence in an unauthorized area; violation of administrative directives; conspiracy to commit misconduct; and, failure to report the presence of contraband.  (Doc. Nos.  114 ¶ 16 & 116 ¶ 38.)  On the basis of the discovery

19

of the ring, defendant Nolte charged the plaintiff with seven violations: theft; possession of contraband; interference with the security of or orderly running of the prison; violation of administrative directives; conspiracy to commit misconduct; and, failure to report the presence of contraband. (Doc. No. 116 ¶ 47.)  Both incident reports were delivered to the plaintiff by Corrections Officer Tracy Yohn around 1:00 o'clock on the morning of February 12. (Doc. No. 116 ¶¶ 39 & 48.)

On February 13, defendant Bishop presided over a hearing with two other officers to adjudicate the two misconduct reports against the plaintiff. (Doc. Nos. 114 ¶ 20 & 116 ¶¶ 110-111 & 118.) Before February 13, the hearing board reviewed a report of extraordinary occurrence written by a DCP lieutenant, to which were attached memorandums by four corrections officers, including defendants Nolte and Hill, concerning the February 11 ceiling cavity incident and photographs of the seized contraband, as well as defendant Nolte's February 11 incident reports on the ring incident concerning the plaintiff. (Doc. No. 116 ¶¶ 144-45 & 174.) The incident reports indicated that the plaintiff had been given a copy of the incident reports by Corrections Officer Yohn in the early morning of February 12. (Doc. No. 116 ¶¶ 146 & 175.) At that time, the plaintiff never requested any witnesses and waived his right to representation at his hearing; the plaintiff's waiver is reflected in two disciplinary report forms. (Doc. Nos. 116 ¶ 150-52 & 124 ¶ 20.)

At the hearing, the plaintiff signed the notice of his rights, which includes

the right to have a representative and to call witnesses.  (Doc. No. 116 ¶¶ 148-49 & 177.)  The board recognized that the plaintiff had been informed of his right to and declined to have any witnesses or a representative.  (Doc. No. 116 ¶¶ 152 & 178.)  The plaintiff signed the DCP disciplinary report, indicating that he was informed of the charges, chose not to have a representative, and pled not guilty to all the charges.  (Doc. No. 116 ¶¶ 153-54.)  The plaintiff made a statement to the board in which he denied knowledge of the ceiling cavity incident and claimed the ring was his property, which he had hidden in his shoe to prevent its theft.  (Doc. No. 116 ¶¶ 155 & 179.)

The board unanimously found the plaintiff guilty of all the charges in both misconducts on the basis of the extraordinary occurrence report and its attachments, as well as defendant Nolte's report.  They also considered the statements of the other shakedown inmates in their hearings, which were conducted the same day. (Doc. Nos. 114 ¶ 21, 116 ¶ 156, 158, & 180-81, & 124 ¶¶ 21 & 28.)  With respect to the ceiling cavity incident, the board found the plaintiff's statement to be incredible because the ring had been found in his shoe.  They also found that the plaintiff's presence outside his cell when defendant Nolte discovered the inmates in the ceiling cavity to be significant because of the layout of the shakedown unit.  (Doc. No. 116 ¶¶ 159-60.)  On the misconduct arising out of the theft of the inmate property boxes, the plaintiff was sentenced to 120 days' lock-in on all ten charges and loss of good-time credit. (Doc. Nos. 114 ¶ 24 & 116 ¶¶ 162-169.) On the misconduct

arising out of the contraband ring, the plaintiff was sentenced to ninety days' lock-in on all seven charges and loss of good-time credit.  (Doc. No. 116 ¶¶ 182-184.)  The DCP major and a deputy warden reviewed and approved the plaintiff's convictions and sentences.  (Doc. No. 116 ¶¶ 170-71 & 185-86.) According to the defendants, the sentences accorded with DCP policy based on the plaintiff's prior offenses and the severity of the current offenses.  Prior to the February 13 hearing, the plaintiff had been convicted of two class one, level one convictions and one class one, level three conviction.   On the property box incident, the plaintiff was convicted of two class one, level one charges; one class one, level two charge; and, seven class one, level three charges.  On the basis of the plaintiff's third class one, level one conviction, the sentencing guidelines called for, and the board applied, the 120 days' lock-in.  On the ring incident, the plaintiff was convicted of two class one, level one offenses and five class one, level three offenses.  Under the sentencing guidelines, the plaintiff was properly sentenced to 90 days' lock-in. (Doc. No. 116 ¶¶ 164-171 & 180-86.)

In contrast, the plaintiff offers a different version of events: Prior to the hearing, the plaintiff contends that he was never asked whether he wanted any witnesses or a representative or to sign any notice of the hearing.  He denies that Corrections Officer Yohn read the charges to him.  (Doc. No. 133 ¶¶ 123-27, 134, & 178.)   He contends that the panel never reviewed the extraordinary occurrence report.  (Doc. No. 133 ¶ 144.)  At the hearing, the

plaintiff admits that he signed the DCP disciplinary report, but contends he did so only to commence the proceedings and to show that he knew the charges, pled not guilty, and represented himself, not that he did not want a representative.  (Doc. No. 133 ¶ 1454.)  He contends that he was not allowed to "offer any exculpatory evidence . . . , but was only asked to 'tell' (inform) on inmates who were truly involved in 2/11/04 Shakedown incident."  (Doc. No. 114 ¶ 22.)  He denies making the statements the defendants proffer, instead arguing that he remained in his cell during the ceiling cavity incident and that the ring was his property.  (Doc. No. 133 ¶¶ 155, 159, & 179.)

According to the plaintiff, defendant Bishop refused to allow him to call any witnesses or to have representation and there is no evidence that he ever agreed to waive his rights.  (Doc. No. 114 ¶ 20.)  Also, defendant Bishop never deliberated or consulted with the other panelists, but instead found the plaintiff guilty and sentenced him upon the conclusion of the hearing.  (Doc. No. 133 ¶¶ 135 & 181.)  Nor could defendant Bishop have relied on the other inmates' statements because the plaintiff's hearing was first.  (Doc. No. 133 No. 156.)  The plaintiff claims that "Defendant Bishop never gave a reason for the action taken against" him–the conviction and the punishment–and that there was insufficient evidence to support a guilty finding.  (Doc. Nos. 114 ¶¶ 27 & 28 & 133 ¶¶ 136 & 180.)  He also argues that his sentence was inappropriately calculated because he did not have the prior convictions that the defendants claim and the classification and sentences for the February 13

23

convictions were incorrect.  (Doc. No. 133 ¶¶ 136, 138, 164-71, & 180-86.) After the hearing, the plaintiff contends that the DCP major and deputy warden could not have reviewed the sentence because it was improper. (Doc. No. 133 ¶¶ 140, 171, & 185-86.)

## III.   Discussion

### A.   Liability Under § 1983

Section 1983 creates no substantive rights, but rather allows a plaintiff to vindicate violations of rights created by the U.S. Constitution or federal law. Baker v. McCollan, 443 U.S. 137, 145 n.3 (1979); Kaucher v. County of Bucks, 455 F.3d 418, 423 (3d Cir. 2006).  To state a claim under §1983, the plaintiff must show that the defendant, acting under color of state law, deprived him of a right secured by the Constitution or laws of the United States.  42 U.S.C. §1983; American Mfrs. Mut. Ins. Co. v. Sullivan, 526 U.S. 40, 49-50 (1999); Kaucher, 455 F.3d at 423.  Liability under §1983 is personal in nature, and a defendant is liable only if he was personally, affirmatively involved in the alleged malfeasance.  Robinson v. City of Pittsburgh, 120 F.3d 1286, 1294 (3d Cir. 1997), abrogated in part on other grounds by Burlington N. & Santa Fe Ry. Co. v. White, – U.S. –, 126 S.Ct. 2405 (2006) (citing Rhode v. Dellarciprete, 845 F.2d 1195, 1207 (3d Cir. 1988); Andrews v. City of Philadelphia, 895 F.2d 1469, 1478 (3d Cir. 1990)). A defendant who supervised a malfeasor but did not actually inflict the malfeasance is not liable

24

under §1983 on a theory of <u>respondeat</u> <u>superior</u> unless he personally directed or had actual knowledge of, and acquiesced in, the deprivation because such nonfeasance is equivalent to personal, affirmative involvement.  <u>Polk County v. Dodson</u>, 454 U.S. 312, 325 (1981) (citing <u>Monell v. New York City Dep't of Soc. Servs.</u>, 436 U.S. 658, 694 (1978)); <u>Robinson</u>, 120 F.3d at 1294.  A defendant who lacked any supervisory power over the malfeasor and who was not personally, affirmatively involved in the malfeasance is not liable under §1983.  <u>Robinson</u>, 120 F.3d at 1294.

Here, the court finds that the plaintiff has not sufficiently alleged, under the standard for summary judgment, the personal involvement of defendant DeRose.  The plaintiff argues that defendant DeRose personally ordered the strip cell status, leading to the alleged constitutional deprivations at issue in this case. He contends that various corrections officers, whom he names, told him of defendant DeRose's involvement. Yet, the plaintiff has not produced any evidence, such as affidavits from or depositions of the corrections officers, to substantiate his contentions. In contrast, the defendants have not only denied defendant DeRose's involvement in the alleged deprivations, but have produced affidavits from defendant DeRose and other prison officials substantiating his lack of involvement.  Accordingly, the court finds that the plaintiff has not met his burden against defendant DeRose of producing more than a mere scintilla of evidence–indeed, he has not even produced a scintilla–, but instead relies merely on bald allegations.  Allegations alone do

not give rise to a genuine issue of material fact concerning defendant DeRose's involvement. Therefore, the court recommends that the defendants' motion for summary judgment be granted as to defendant DeRose because of his lack of personal involvement and the plaintiff's complaint be dismissed against him on this ground.    Notwithstanding this finding and recommendation, the court will substantively analyze the strip-search and conditions-of-confinement allegations against defendant DeRose.

### B.    Fourth Amendment Strip Search Allegation Against Defendant DeRose

Inmates retain certain constitutional protections, and "pretrial detainees, who have not been convicted of any crimes, retain at least those constitutional rights that . . . are enjoyed by convicted prisoners."  Bell v. Wolfish, 441 U.S. 520, 545 (1979).  But the rights that pretrial detainees enjoy, like the rights of convicted prisoners, are "subject to restrictions and limitations."  Id.; see id. at 545-46 ("'Lawful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system.'") (quoting Price v. Johnston, 334 U.S. 266, 285 (1948)).  A correctional facility may properly balance its institutional needs with the inmates' constitutional protections even if fulfilling its needs requires infringing on those protections. Id.  The necessity of "maintaining institutional security and preserving internal order and discipline" allows a facility to limit or retract a detainee's rights. Id. at 546-47.

26

Consequently, when a court is reviewing an institution's infringement of a detainee's rights, it must evaluate the infringing practice "in the light of the central objective of prison administration, safeguarding institutional security." Id. at 547.  Furthermore, when doing so, the court must defer to the facility administrators' choices "in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security."  Id.

Inmates retain their rights under the Fourth Amendment, which prohibits unreasonable searches.  Id. at 559.  The reasonableness of any search is determined on a case-by-case basis through a balancing test that weighs "the need for the particular search against the invasion of personal rights that the search entails."  Id.  The court "must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted."[2]  Id.

Here, considering the standard for summary judgment and the deference due to the defendants, the court finds that the plaintiff has failed to show a genuine issue of material fact as to his strip-search claim.  There is no dispute that the plaintiff endured a strip search during each shift of each day that he was under strip-cell status, but under the Bell factors, all of these

---

[2]In Bell, the Supreme Court found that a pretrial detainees could reasonably be subjected to a visual body-cavity search "after every contact visit with a person from outside the institution" by prison officials who sought to prevent the introduction of contraband, even though the officials had discovered contraband through such a search only once.  441 U.S. at 558-60.

strip searches of the plaintiff were reasonable.  Most compelling in the <u>Bell</u> analysis is the justification for the search.  The defendants have submitted uncontroverted evidence that contraband, including weapons and potential weapons, was discovered on February 11.  They have submitted further evidence, which the plaintiff's bald and unsubstantiated denials fail to controvert, that they continued to discover contraband during all three shifts on February 12 and on various shifts later in the week.[3]  They have also submitted evidence, again which the plaintiff's mere denials cannot controvert, that they received credible warning of a possible escape attempt.  During this time, according to the defendants' evidence, the DCP officials reasonably feared a threat to the institution and its inmates and staff.  They have shown that contraband, especially weapons, pose a significant problem for the DCP's security and its staff's and inmates' safety.  Thus, the strip searches were part of a comprehensive effort, including cell searches, to ensure that contraband was not introduced into the shakedown unit.  As the defendants have shown, it was reasonable to worry that the inmates had secreted additional

---

[3]The plaintiff asserts that it was impossible for the shakedown inmates to have more contraband because their cells and persons had been thoroughly searched on February 11. But his mere contention that something was impossible does not actually mean it was in fact impossible.  One might think it impossible that inmates in the shakedown unit could steal twenty-two boxes without being discovered sooner than they were. Without more, without some substantiation, the plaintiff's mere denial is insufficient to establish a genuine issue of fact.  Furthermore, the court notes that in <u>Bell</u>, the Supreme Court found reasonable searches of inmates after every time they received visitors where only one search had ever revealed contraband.

contraband in addition to the contraband  seized in the ceiling cavity and the initial strip-cell searches, and it was reasonable to worry that an inmate, knowing that his cell was to be searched, would hide contraband on his person.

The other Bell factors, too, weigh in the defendants' favor.  The scope of the searches was limited to once per shift.  The defendants have indicated that this was necessary because inmates received meals and medicine from outside the cell block and occasionally left the cell block.  The defendants feared that these instances could lead to the introduction of contraband. Even if the plaintiff had not received a meal or left the cell block since the last strip search, it is conceivable that his cellmate or another inmate who had received a meal or left the cell block could have had access to contraband. The manner and place of the searches was also reasonable.  The searches were not invasive, but limited to non-cavity searches of the naked inmates. The searches were conducted in the cells, in a semi-private atmosphere. Although the plaintiff argues that strip searches offend him as a Muslim, a balancing of the DCP's and his interests shows that, in spite of any subjective offense he might have incurred, the searches reasonably served a legitimate penological interest and do not offend the spirit of Bell.

Accordingly, the court finds that the plaintiff has failed to offer more than a mere scintilla of evidence to establish a genuine issue of material fact concerning the strip searches endured by the plaintiff between February 11

and February 18.   The searches were reasonable under the Fourth Amendment as interpreted by Bell.   Therefore, the court recommends that the defendants' motion for summary judgment be granted as to defendant DeRose because the strip searches were not unconstitutional and the plaintiff's complaint be dismissed against him on this ground.

### C.    Fourteenth Amendment Conditions of Confinement Allegation Against Defendant DeRose

The government "may permissibly detain a person suspected of committing a crime prior to a formal adjudication of guilt" without violating a person's right to due process under the Fourteenth Amendment.   Id. at 534-36 (analyzing Fifth Amendment rights of detainees in Federal custody); see Hubbard v. Taylor, 399 F.3d 150, 158 n.13 (3d Cir. 2005) (applying Bell to Fourteenth Amendment rights of detainees in state custody).   Concomitant with the right to detain a suspect is the right to restrict the detainee's freedom. Id. at 536-37.   But while the government may restrict an incarcerated pretrial detainee's freedom, it may not subject him to punishment.   Id.; see id. at 537 ("Not every disability imposed during pretrial detention amounts to 'punishment' in the constitutional sense, however.   Once the Government has exercised its conceded authority to detain a person pending trial, it obviously is entitled to employ devices that are calculated to effectuate this detention. Traditionally, this has meant confinement in a facility which, no matter how modern or how antiquated, results in restricting the movement of a detainee

in a manner in which he would not be restricted if he simply were free to walk the streets pending trial.  Whether it be called a jail, a prison, or a custodial center, the purpose of the facility is to detain.  Loss of freedom of choice and privacy are inherent incidents of confinement in such a facility.  And the fact that such detention interferes with the detainee's understandable desire to live as comfortably as possible and with as little restraint as possible during confinement does not convert the conditions or restrictions of detention into 'punishment.'").  There is "a distinction between punitive measures that may not constitutionally be imposed prior to a determination of guilt and regulatory restraints that may."  Id. at 537.

When a court is confronted by a pretrial detainee's conditions-of-confinement claim, the Supreme Court has held:

> A court must decide whether the disability is imposed for the purpose of punishment or whether it is but an incident of some other legitimate governmental purpose.  Absent a showing of an expressed intent to punish on the part of detention facility officials, that determination generally will turn on "whether an alternative purpose to which [the restriction] may rationally be connected is assignable for it, and whether it appears excessive in relation to the alternative purpose assigned [to it]."  Thus, if a particular condition or restriction of pretrial detention is reasonably related to a legitimate governmental objective, it does not, without more, amount to "punishment."  Conversely, if a restriction or condition is not reasonably related to a legitimate goal–if it is arbitrary or purposeless–a court permissibly may infer that the purpose of the governmental action is punishment that may not constitutionally be inflicted upon detainees qua detainees."

Id. at 538-39 (quoting Kennedy v. Mendoza-Martinez, 372 U.S. 144, 168-169 (1963)) (brackets in original; internal citations and footnotes omitted).  The

31

Supreme Court has articulated two reasons for imposing disabilities on a detainee.  The primary, obvious reason is to ensure a detainee's presence at trial. Id. at 539-40.  But another important reason is to maintain the safety and security of the detention facility. Id. at 540 ("Restraints that are reasonably related to the institution's interest in maintaining jail security do not, without more, constitute unconstitutional punishment, even if they are discomforting and are restrictions that the detainee would not have experienced had he been released while awaiting trial.").  The rational-relationship test is deferential.  Institutional security, order, and operations are "peculiarly within the province and professional expertise of corrections officials, and, in the absence of substantial evidence in the record to indicate that the officials have exaggerated their response to these considerations, courts should ordinarily defer to their expert judgment in such matters." Id. at 540 n.23 (quoting Pell v. Procunier, 417 U.S. 817, 827 (1974)).

The Third Circuit Court of Appeals has "distilled" from Bell a two-part test.[4]  First, the court must determine whether the challenged conditions serve any legitimate purpose.  Second, the court must determine whether the

---

[4]This court, both in the first report and recommendation and in the memorandum and order, stated the incorrect test for a conditions-of-confinement claim by a pretrial detainee.  In both instances, the court used a test derived from the Eighth Amendment, based on its prohibition on cruel and unusual punishment.  However, as the Third Circuit recognized in Hubbard, the Eighth Amendment is inapplicable to pretrial detainees. The  court in Hubbard expressly rejected an Eighth Amendment standard. 399 F.3d at 163-67.

conditions are rationally related to that purpose.  Hubbard, 399 F.3d at 159.
The second step entails an inquiry into "whether these conditions cause
[inmates] to endure [such] genuine privations and hardship over an extended
period of time, that the adverse conditions become excessive in relation to the
purposes assigned to them." Id. at 159-60 (quoting Union County Jail Inmates
v. DiBuono, 713 F.2d 984, 992 (3d Cir. 1983)) (internal quotation omitted).
In addition, the court must consider "the totality of circumstances within an
institution"–all of the complained-of conditions–, and not any individual
condition.  Id. at 160.

Here, the court finds that the plaintiff has failed to show a genuine issue
of material fact as to his conditions-of-confinement claim.  First, the court
finds that the plaintiff has not met his burden of producing more than a mere
scintilla of evidence to controvert the defendants' evidence.  The plaintiff
relies on bald assertions and denials of the defendants' claims to sustain his
case without producing evidence to substantiate his claims.  In addition, he
argues that the defendants have lied in their submissions and fabricated
evidence.  The defendants, in contrast, have submitted multiple affidavits and
other record evidence to support their defenses.  For instance, while the
plaintiff claims that he and his cell were stripped of everything except toilet
paper, his cell was frigid and pestilential, and his toilet and sink leaked, the
only evidence submitted supports the defendants' averments that the plaintiff
retained his uniform and bedding, the cell was temperate and not infested with

vermin, and the toilet and sink did not leak.  The court notes, as it mentioned above, that five other inmates allegedly suffered from the deprivations alleged by the plaintiff, yet the plaintiff has not submitted any evidence from any of them to substantiate his claims.

Second, in consideration of the record before the court and the deference it owes the defendants, the court finds that the conditions for which there is evidence–the conditions authorized under the DCP's strip-cell policy and procedures and admitted to by the defendants–do not rise to the level of a Fourteenth Amendment due process violation under Bell and Hubbard.  The plaintiff cannot show any genuine dispute of fact as to his being punished instead of merely being subjected to policies and procedures necessary to maintain security and order at the DCP.  Under the Hubbard test, the substantiated facts show that there was a legitimate reason for the  imposition of the strip-cell status that allegedly led to the unconstitutional conditions of confinement complained of here.  The defendants submit that they imposed the strip-cell status to ensure the safety of the DCP's inmates and staff, as well as the security of the institution, after they discovered that the shakedown inmates possessed stolen inmate property boxes and other contraband, including weapons, accessed a ceiling cavity, and, the defendants feared, were planning an escape.  As the Supreme Court has stated, maintaining order and safety is a legitimate purpose for the imposition of disciplinary measures.  The conditions complained of by the plaintiff fulfilled that purpose

34

by seeking to prevent the inmates from obtaining any further contraband or accessing restricted areas.

The substantiated conditions were a reasonable means of effecting the DCP's purpose.  The evidence shows that contraband was found in all three shakedown cells, as well as on most of the inmates, including the plaintiff. Even after the strip-cell status was imposed, contraband continued to be discovered for days after the February 11 incident.  The inmates' meals and medicines were delivered from off the cell block, which the defendants feared could lead to the introduction of contraband.  On several occasions, the inmates, including the plaintiff, were removed from the cell block, during which time the defendants feared they could access contraband.  The defendant claims that the continued conditions were unreasonable because the delivery of meals and off-block visits were supervised and affected all inmates when not all inmates had been taken off-block. But the evidence–especially the continued discovery of contraband–suggests that it was reasonable for the defendants to continue imposing conditions designed to make it more difficult for the inmates to access contraband and to hide it from the guards. Moreover, it is reasonable to impose the conditions on all the inmates equally because of the fear that they could otherwise pass contraband back-and-forth to frustrate the conditions.  Additionally, the imposition of the conditions was limited because the DCP sought to move the shakedown inmates to other housing units as quickly as possible.  The plaintiff endured them for only one

week before he was transferred.

In sum, on the record before it, the court cannot find that the totality of the conditions that the plaintiff complains of indicates that the conditions were excessive in consideration of their purpose.  Accordingly, the court finds that there is no issue of material fact concerning the conditions of confinement endured by the plaintiff between February 11 and February 18. The conditions were rationally related to a legitimate purpose.  Therefore, the court recommends that the defendants' motion for summary judgment be granted as to defendant DeRose because the conditions of confinement were not unconstitutional and the plaintiff's complaint be dismissed against him on this ground.

### D.    Fourteenth Amendment Due Process Claim on the Basis of the Recreation Time Allegation Against Defendant Nolte

As noted above, pretrial detainees are not protected by the Eighth Amendment, but receive at least the same level of constitutional protections that the Eighth Amendment provides convicted prisoners under the Fourteenth Amendment.  See Simmons v. City of Philadelphia, 947 F.2d 1042, 1068 (3d Cir. 1991).  Thus, a pretrial detainee's claim that a corrections officer failed to protect him while in custody is analyzed under the Fourteenth Amendment according to the Eighth Amendment standard.  See id.  The Eighth Amendment prohibits cruel and unusual punishment, which is implicated "only [by] the unnecessary and wanton infliction of pain."  Farmer

v. Brennan, 511 U.S. 825, 828, 834 (1994) (quoting Wilson v. Seiter, 501 U.S. 294, 297 (1991)).  The Eighth Amendment requires that prison officials protect inmates from violence at the hands of other inmates. Id. at 833; see id. ("Having incarcerated 'persons [with] demonstrated proclivit[ies] for antisocial criminal, and often violent, conduct,' having stripped them of virtually every means of self-protection and foreclosed their access to outside aid, the government and its officials are not free to let the state of nature take its course.") (quoting Hudson v. Palmer, 468 U.S. 517, 526 (1984)).

A prisoner raising a failure-to-protect claim must establish two elements to prevail. Id. at 834.  First, the alleged deprivation of protection must be, "objectively, 'sufficiently serious,'" which means that the detainee was subjected to "conditions posing a substantial risk of serious harm."  Id. quoting Wilson, 501 U.S. at 298)).  Second, the defendant must have been deliberately indifferent "to a substantial risk of serious harm to an inmate." Deliberate indifference is the mens rea requirement of an Eighth Amendment claim; the plaintiff must show that the defendant had a "'sufficiently culpable state of mind.'"  Farmer, 511 U.S. at 834 (quoting Wilson, 501 U.S. at 298)). The test of deliberate indifference is subjective. Id. at 837-38.  To be liable for deliberate indifference under the Eighth Amendment, the plaintiff must show that the prison official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and

he must also draw the inference." Id. at 837.  The prison official must have actual knowledge; a risk that he "should have perceived but did not" does not give rise to liability.[5]  Id. at 837-38.  Consequently, it is clear that under the Supreme Court's jurisprudence, accidental injuries to prisoners are not cognizable under the Eighth Amendment.

Here, the court finds that the plaintiff has failed to establish a genuine issue of material fact as to defendant Nolte's alleged failure to protect him by releasing all the shakedown inmates together for recreation time.  First, the plaintiff has not shown that the cells' being opened at the same time was objectively, sufficiently serious.  The plaintiff claims that he remained in his cell during recreation time.  He has not alleged that any other inmate threatened or harassed him or that he feared them.  Moreover, the mere releasing of six inmates together does not, without more to indicate a sufficiently serious risk of danger, indicate that the plaintiff was exposed to danger.  Defendant Nolte purposefully may have not followed a DCP practice or policy, but that alone does not show objectively a high disregard for the safety of the shakedown inmates.

Second, the plaintiff has adduced no evidence showing that defendant Nolte was deliberately indifferent to the plaintiff's safety.  There is no evidence that defendant Nolte actually knew of and disregarded a substantial risk of

---

[5]A prisoner's redress where a prison official lacked actual knowledge is tort law.  Farmer, 511 U.S. at 837-38.

serious harm to the plaintiff.  The plaintiff had not complained of a threat from other inmates; indeed, he was in the shakedown unit because he feared the corrections officers.   No reasonable factfinder could possibly find that defendant Nolte had a definite knowledge of a risk to the plaintiff and inferred that his actions could lead to harm.[6]

Accordingly, the court finds that there is no issue of material fact concerning the common recreation time endured by the plaintiff on February 18.  Therefore, the court recommends that the defendants' motion for summary judgment be granted as to defendant Nolte because his release of the six inmates together was not objectively serious or deliberately indifferent and the plaintiff's complaint be dismissed against him on this ground.

### E.    Fourteenth Amendment Due Process Claims on the Basis of the Misconducts   Against Defendant Nolte and Defendant Bishop[7]

The Fourteenth Amendment prohibits a state from "depriv[ing] any person of life, liberty, or property without due process of law."  U.S. CONST. amend. XIV, §1. "The touchstone of due process is protection of the individual against arbitrary action of government."  Wolff v. McDonnell, 418 U.S. 539,

---

[6]The court also notes that the plaintiff's claim is frivolous because he suffered no injury or threat of injury from the inmates during recreation time.

[7]Although the claims are presented separately as against defendants Nolte and Bishop, the court treats them together because of the interrelatedness of their analyses.

558 (1974) (citing <u>Dent v. West Virginia</u>, 129 U.S. 114, 123 (1889)). Procedural due process means a state can deprive a person of his life, liberty, or property only so long as the deprivation is justified by a procedure appropriate to the nature of the deprivation.  <u>Carey v. Piphus</u>, 435 U.S. 247, 259 (1978).

In this case, the plaintiff has challenged three aspects of the disciplinary process against him: the issuance of allegedly false misconducts; the misconduct hearing; and, the punishments.  With respect to the allegedly false misconduct reports, the Fourteenth Amendment is generally not implicated when an inmate is charged, even falsely, with misconduct: "so long as certain procedural requirements are satisfied, mere allegations of falsified evidence or misconduct reports, without more, are not enough to state a due process claim."[8]  <u>Smith v. Mensinger</u>, 293 F.3d 641, 653-54 (3d Cir. 2002).

With respect to the hearings, "[p]rison disciplinary proceedings are not part of a criminal prosecution, and the full panoply of rights due a defendant in such proceedings does not apply."  <u>Wolff v. McDonnell</u>, 418 U.S. 539, 556 (1974).  Due process is satisfied in an inmate's disciplinary hearing where the inmate receives four procedural protections: written notice of the charge at least twenty-four hours before the hearing; an opportunity to present

---

[8]There is an exception where the false misconduct was issued in retaliation for the inmate's exercise of his constitutional rights, but that is not at issue here.  <u>Smith</u>, 292 F-3d at 653.

witnesses and documentary evidence[9]; an impartial tribunal; and, a written statement by the adjudicatory board describing the evidence relied upon and the reasons for reaching its decision.[10]  Id. at 562-72.  In addition,  there must be "some evidence" to support the disciplinary board's decision.  Superintendent v. Hill, 472 U.S. 445, 457 (1985).  If there is "any evidence in the record that could support the conclusion reached by the disciplinary board," then due process is satisfied.  Id. at 455-56.

With respect to the punishments, the procedures due under Wolff protect only an inmate's constitutional interests.  Sandin v. Conner, 515 U.S. 472, 487 (1995).  An inmate has no constitutional interest in being free from disciplinary segregation, such as the lock-in sentence imposed on the plaintiff in the instant case, because it is not an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life."  Id. at 484; see Griffin v. Vaughn, 112 F.3d 703, 706 (3d Cir. 1997).  But an inmate has a constitutional interest in any good-time credits provided by the state, and when he is faced with their loss in a disciplinary hearing, he is entitled to the protections recognized by Wolff.  Wolff, 418 U.S. at 556-58.

---

[9]The right to call witnesses may be restricted when it would be "unduly hazardous to institutional safety or correctional goals."  Wolff, 418 U.S. at 566.

[10]If the inmate is illiterate or the issues are so complex that the inmate is unable to effectively defend himself, he is entitled to assistance from another inmate or a member of the prison's staff.  Wolff, 418 U.S. at 570. This is not at issue here because procedures at the DCP allow inmates to have a representative.

Here, the court finds that the plaintiff has failed to establish an issue of material fact as to any of his claims stemming from the two misconduct reports and the disciplinary hearing.  To the extent that the plaintiff claims he was charged falsely by defendant Nolte, he simply has no recourse under the Fourteenth Amendment unless he can show that he was deprived of due process in the subsequent disciplinary hearing, which the court finds implausible.  To the extent the plaintiff challenges the disciplinary hearing, the plaintiff has failed to produce any evidence showing that defendant Bishop violated his due process rights in the conduct of the hearing.  The record before the court shows that the disciplinary process met the requirements delineated in Wolff.  The plaintiff received the two written notices of the charges against him at approximately 1:00 am on February 12, more than twenty-four hours before the hearings on February 13.  He was given an opportunity to ask for witnesses and a representative, but declined both.  The plaintiff contends that he was, in fact, not offered these, but he has presented no more than his unsubstantiated claims. The documentary evidence presented by the defendants, supported by affidavits from various corrections officers, supports the conclusion that the plaintiff turned down the opportunity to call any witnesses or to have a representative.   The uncontroverted evidence shows that the hearing board was impartial.  Again, the plaintiff denies this contention, but has offered no support for it beyond his bald allegation.  In contrast, the defendants' evidence and affidavits indicates that

the three-member panel was indeed impartial.  Furthermore, there is no evidence to support the plaintiff's claim that defendant Bishop alone found the plaintiff guilty and sentenced him.  The board issued a written statement on each misconduct report, which stated the basis of its findings.  The plaintiff has not met his burden in controverting the defendants' evidence.  In addition, the record is clear that there is "some evidence" supporting the board's findings; in fact, there is ample evidence on the basis of which the board could have reached its conclusion.

Lastly, to the extent the plaintiff challenges his sentences, he may not raise a due process claim concerning his sentence to disciplinary lock-in, but may only challenge the loss of good-time credit.  But, because the court finds that the disciplinary process leading to the credit's loss comported with due process, the plaintiff has no viable claim.  The hearing was conducted properly, in accordance with due process.  The sentences were imposed properly under the DCP's sentencing guidelines.  The plaintiff's contentions, as with the bulk of his denials, are unsubstantiated, in contradistinction to the defendants' assertions, which are supported by the evidence.

The court's conclusions concerning the plaintiff's disciplinary process ineluctably lead the court to recommend that the plaintiff's motion for summary judgment be denied because he cannot establish a lack of a genuine issue of material fact as to defendant Bishop depriving him of due process.  To the contrary, the uncontroverted evidence before the court

indicates that defendant Bishop did not violate the plaintiff's due process rights.

Consequently, because the court finds that the hearing satisfied the Fourteenth Amendment's requirements, it finds accordingly that defendant Nolte did not violate the plaintiff's rights by issuing the misconducts and defendant Bishop did not violate the plaintiff's rights in the conduct of the hearing or the sentence subsequently imposed.   Therefore, the court recommends that the defendants' motion for summary judgment be granted as to defendant Nolte because his issuing the misconducts, false or not, did not violate due process and as to defendant Bishop because his conduct in respect of the disciplinary process did not violate the plaintiff's due process rights. Further the plaintiff's complaint be dismissed against them on these grounds.   Finally, the court recommends that the plaintiff's motion for summary judgment be denied as meritless.

## IV.   Conclusion

On the basis of the foregoing, **IT IS RECOMMENDED THAT**:

(1).   the defendants' motion for summary judgment be **GRANTED** and the plaintiff's complaint be **DISMISSED** in its entirety as against defendant DeRose on the ground that he was not personally involved in the allegations contained in the underlying complaint;

(2).   the defendants' motion for summary judgment be **GRANTED** and

the plaintiff's complaint be **DISMISSED** with respect to the claims of a Fourth Amendment violation as against defendant DeRose, on the ground that the strip searches did not violate the plaintiff's constitutional rights;

(3).   the defendants' motion for summary judgment be **GRANTED** and the plaintiff's complaint be **DISMISSED** with respect to the claim of a Fourteenth Amendment violation as against defendant DeRose, on the ground that the conditions of confinement did not violate the plaintiff's constitutional rights;

(4).   the defendants' motion for summary judgment be **GRANTED** and the plaintiff's complaint be **DISMISSED** with respect to the claim of a Fourteenth Amendment violation as against defendant Nolte, on the ground that the common recreation time did not violate the plaintiff's constitutional rights;

(5).   the defendants' motion for summary judgment be **GRANTED** and the plaintiff's complaint be **DISMISSED** with respect to the claim of a Fourteenth Amendment violation as against defendant Nolte, on the ground that the issuance of the misconduct reports did not violate the plaintiff's constitutional rights;

(6).   the defendants' motion for summary judgment be **GRANTED** and the plaintiff's complaint be **DISMISSED** with respect to the claim of a Fourteenth Amendment violation as against defendant

Bishop, on the ground that the conduct of the misconduct hearings and the sentences of loss of good-time credit did not violate the plaintiff's constitutional rights;

(7).    the plaintiff's motion for summary judgment against defendant Bishop be **DENIED**; and,

(8).    the case be set down for trial solely on the plaintiff's claim of excessive use of force against defendant Hill.

S/ Malachy E. Mannion

**MALACHY E. MANNION**
United States Magistrate Judge

Date: December 20, 2006

O:\shared\REPORTS\2005 Reports\05-0342.02.wpd