IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

BERNARD G. JOHNSON, JR.,           :
                                   :
     Plaintiff,                    :CIVIL ACTION NO. 05-CV-342
                                   :
     v.                            :
                                   :
DOMINICK L. DEROSE, WARDEN; TED    :
BISHOP; KEN NOLTE, CORRECTIONAL    :(JUDGE CONABOY)
OFFICER; JIM HILL, CORRECTIONAL    :(Magistrate Judge Mannion)
OFFICER,                           :
                                   :
     Defendants.                   :

---

**MEMORANDUM**

In this Memorandum, we consider Magistrate Judge Malachy E. Mannion's Report and Recommendation (Doc. 147) concerning *pro se* federal prisoner Bernard G. Johnson's ("Plaintiff") 42 U.S.C. § 1983 action arising from his pretrial detainment at Dauphin County Prison ("DCP") in 2004.  Pending before the Court are the parties' renewed motions for summary judgement.  (Docs. 111, 115.)

As a preliminary observation, we note this case presents a complex procedural and factual back ground, including the nature of the incident and the types of personalities involved.  Throughout the abundance of writing, argumentation and confusion, the Court has continuously sought to ensure all parties' rights are recognized and given careful consideration.

In our prior Memorandum and Order (Doc. 70) of April 11, 2006, we considered the parties' first motions for summary judgment (Docs. 31, 36, 49, 52).  This Court dismissed Plaintiff's equal

protection and interference with access to the courts claims.
(Doc. 70 at 54-55.)  Additionally, we dismissed without prejudice
Plaintiff's claims arising from events occurring after June 23,
2004, based on failure to exhaust administrative remedies.  (*Id.* at
55.)  Thus, Defendants Taylor and Danner were dismissed from this
action.  (*Id.*)  Plaintiffs remaining claims were remanded to the
Magistrate Judge for further proceedings as to Defendants DeRose,
Bishop, Nolte and Hill.  (*Id.* at 55-58.)  The remaining claims
remanded were: Fourth Amendment claim only as it applies to strip
searches which occurred in February 2004; excessive force claim
against Defendant Hill; conditions of confinement claim as it
applies to the period from February 11, 2004, to February 18, 2004;
and Fourteenth Amendment due process claims as related in incidents
occurring before June 23, 2004.  (*Id.* at 55.)

     Upon remand, the Magistrate Judge permitted considerable
discovery as reflected by the docket and parties' various filings.
We also note, the Magistrate Judge considered such additional
discovery in making his recommendation as to the parties current
motions (Docs. 111, 115).  (Doc. 147.)

     We now turn to the Magistrate Judge's most recent Report and
Recommendation concerning the parties' renewed motions for summary
judgmet (Docs. 111, 115).  (Doc. 147.)  The Magistrate Judge
recommends the Court grant Dauphin County Prison Warden Dominick L.
DeRose's, DCP Lieutenant Ted Bishop's, and Corrections Officer Ken

Nolte's (collectively "Defendants") Motion for Summary Judgment (Doc. 115). (Doc. 147.) Additionally, he recommends the Court deny Plaintiff's Motion for Summary Judgment (Doc. 111). (Doc. 147.) Finally, the Magistrate Judge recommends the case should proceed to trial solely on Plaintiff's claim of excessive use of force against Defendant Hill. (Doc. 147.) In our previous Memorandum and Order (Doc. 70), this Court recognized the excessive force claim against Defendant Hill was to go forward and Defendants did not seek summary judgment on this claim in their renewed motion for summary judgment (Doc. 115).

On January 11, 2007, Plaintiff filed objections to Magistrate Judge Mannion's Report and Recommendation. (Doc. 148) On February 9, 2007, Defendants filed their Brief in Opposition to Plaintiff's Objections to the Report and Recommendation. (Doc. 153.) Plaintiff did not file a reply brief and the time for such filing has passed. Therefore, this matter is now ripe for disposition.

When a magistrate judge makes a finding or ruling on a motion or issue, his determination should become that of the court unless objections are filed. *See Thomas v. Arn*, 474 U.S. 140, 150-53 (1985). When no objections are filed, the district court need only review a record for clear error. *See Cruz v. Chater*, 990 F. Supp. 375, 376-78 (M.D. Pa. 1998). However, when a Petitioner files objections to a magistrate judge's Report and Recommendation, the district judge makes a *de novo* review of those portions of the

report or specified proposed findings or recommendations to which objection is made. *See Cippolone v. Liggett Group, Inc.*, 822 F.2d 335, 340 (3d Cir. 1987), *cert. denied*, 484 U.S. 976 (1987).

Magistrate Judge Mannion specifically recommends Defendant's Motion for Summary Judgment (Doc. 115) be granted and Plaintiff's Complaint[1] be dismissed as to the following: 1) in its entirety against Defendant DeRose based on his lack of personal involvement in conduct underlying Plaintiff's allegations; 2) Plaintiff's Fourth Amendment claim against Defendant DeRose on the ground the strip search did not violate Plaintiff's constitutional rights; 3) Plaintiff's Fourteenth Amendment claim against Defendant DeRose on the ground the conditions of confinement did not violate Plaintiff's constitutional rights; 4) Plaintiff's Fourteenth Amendment claim against Defendant Nolte on the ground the common recreation time did not violate Plaintiff's constitutional rights; 5) Plaintiff's Fourteenth Amendment claim against Defendant Nolte on the ground the issuance of the misconduct reports did not violate Plaintiff's constitutional rights; 6) Plaintiff's Fourteenth Amendment claim against Defendant Bishop on the ground the misconduct hearings and sentences of loss of good-time credit did not violate Plaintiff's constitutional rights. Additionally,

---

[1] Although Magistrate Judge Mannion refers to "[P]laintiff's [C]omplaint[,]" Plaintiff initially filed his Complaint (Doc. 1) and subsequently filed an amended complaint (Doc. 27). We note any dismissal refers to both documents.

Magistrate Judge Mannion recommends Plaintiff's Motion for Summary Judgment (Doc. 111) be denied.  (Doc. 147.)  Finally, he recommends the case be set for trial solely on Plaintiff's claim of excessive use of force against Defendant Hill.  (Doc. 147.)

Plaintiff raises six (6) objections to the Magistrate Judge's Report and Recommendation.  (Doc. 148.)  Thus, we will review the Report and Recommendation generally for clear error and specifically review the matters raised in Plaintiff's exceptions *de novo*.  For the following reasons, we will adopt with modification the Report and Recommendation (Doc. 147), grant Defendant's Motion for Summary Judgment (Doc. 115) and deny Plaintiff's Motion for Summary Judgment (Doc. 111).  Plaintiff's claim of excessive force against Defendant Hill will proceed to trial.

## I.   FACTUAL BACKGROUND

The Magistrate Judge has thoroughly set out the factual background of the case.  (Doc. 147 at 11-24.)  We repeat his recitation below.

> With the standard for summary judgment in mind, the court has compiled from the parties' statements and counter-statements of facts (Doc. Nos. 114, 116, 124, & 133), in accordance with its prior orders, and, as necessary, the evidence on which they are based, the following pertinent factual background to the case. Because the court confronts cross-motions for summary judgment, it accepts as undisputed and true any facts agreed upon by both the plaintiff and defendants or not controverted by the opposing party. The court notes any factual disputes between the parties by presenting

both parties' contentions. However, where it does so, the court does not represent that the party controverting the opposing party's statement has provided support for its denial of that statement. Rather, the court is merely noting dispute regardless of whether the controversy is substantiated in the record. The court will address the issues of supporting evidence, as necessary, in the legal analyses. In the analyses, the court has appropriately applied the standard for summary judgment in analyzing each party's contention. Additionally, because defendant Hill is not moving for summary judgment, facts and allegations that are pertinent only to the case against him are not included here.

On January 6, 2004, the plaintiff, a Federal pretrial detainee, entered the DCP. (Doc. Nos. 114 ¶ 3 & 116 ¶ 2.) Because he feared that his life was endangered by a "huge vendetta" by several corrections officers, the plaintiff was moved to the shakedown housing unit, which was a more secure protective custody area than the RHU. (Doc. Nos. 114 ¶¶ 4 & 6 & 116 ¶¶ 7-9.) There were six inmates in the shakedown unit, including the plaintiff. The plaintiff did not like the other five inmates. According to the plaintiff, they threatened him, but he did not fear them because of his Islamic beliefs and did not feel threatened because he "is rather versed in self-defense." (Doc. No. 133 ¶ 11.) But the plaintiff had no problems with the other inmates. (Doc. Nos. 116 ¶¶ 10-12 & 133 ¶¶ 10-12.) The shakedown inmates were housed in pairs in three cells that lined a corridor that was closed by a door on either end. Neither door had a window through which the corrections officers could see into the shakedown unit. At one end of the corridor, behind a locked door, was the DCP's property room, where inmates' property boxes were stored. The guard station was beyond the property room. (Doc. Nos. 116 ¶¶ 13-14 & 133 ¶ 13.)

The shakedown inmates received one hour of recreation time a day. In February 2004, the DCP's practice, according to the defendants, or policy, according to the plaintiff, was to release one cell at a time. (Doc. Nos. 114 ¶ 6 & 116 ¶16.) However, on February 11, 2004, defendant Nolte simultaneously released all the shakedown inmates for recreation time. (Doc. Nos. 114 ¶ 7& 116 ¶ 22.) According to the defendants, although it was against DCP practice, defendant Nolte opened all the cells because the inmates requested it, which caused defendant Nolte to suspect that "they were up to something." (Doc. No. 116 ¶ 24.) He "agreed to the request to ferret out their intentions." (Doc. No. 116 ¶ 24.) The plaintiff denies the defendants' proffered rationale and claims that defendant Nolte "negligently" released the inmates together "because he was lazy and to follow D.C.P. policy would have required more work and supervision." (Doc. No. 133 ¶ 24.) It is likely that this was the only time that defendant Nolte released the inmates together, though the record is unclear. (Doc. Nos. 116 ¶ 23 & 133 ¶ 23.) According to defendant Nolte, he had no reason to believe that the plaintiff was endangered by the inmates' being simultaneously released. (Doc. No. 116 ¶ 25.) According to the plaintiff, the very nature of the shakedown unit meant that there was danger, and defendant Nolte failed to investigate whether any inmate would be threatened by simultaneous release. (Doc. No. 133 ¶ 25.)

Defendant Nolte entered the corridor during the inmates' recreation time and observed two inmates, but not the plaintiff, in the ceiling area, above light fixture. (Doc. Nos. 114 ¶ 8 & 116 ¶¶ 28 & 29.) Defendant Nolte secured the inmates in the cells. (Doc. Nos. 114 ¶ 8 & 116 ¶ 31.) Upon searching the ceiling cavity, defendant Nolte and other officers discovered twenty-two inmate property boxes, which had apparently been stolen from the adjacent property room,

7

as well as several weapons or potential weapons. (Doc. Nos. 114 ¶ 10 & 116 ¶ 32.) The six inmates, including the plaintiff, denied knowing of or being involved in the theft of the inmate property boxes and their concealment in the ceiling cavity. (Doc. No. 116 ¶ 36.) Defendant Nolte believed that all six inmates had "equal access" to the cavity and its contents because all the cells were open and all the inmates "had clear views" of the ceiling cavity." (Doc. No. 116 ¶¶ 30 & 35.) The plaintiff rejects defendant Nolte's belief, averring that the two inmates caught in the ceiling considered the boxes their property and prevented other inmates from accessing them and that his view of the ceiling area was obstructed. (Doc. Nos. 114 ¶ 40 & 133 ¶¶ 30 & 35.) Defendant Nolte had no reason not to suspect that the plaintiff was involved with the theft or had been in the ceiling cavity prior to February 11, 2004.[2]

---

[2] With regard to Defendant Nolte's knowledge, the Magistrate Judge included the following footnote.  (Doc. 147 at 14 n.1.)

The defendants state, "Plaintiff admits that Nolte had no reason to believe that Plaintiff had not been tampering with or climbing around in the ceiling." (Doc. No. 116 ¶ 37.) The plaintiff denies the statement and contends that he "never stated that Defendant Nolte had 'no' reason to believe" that he was not involved in the incident. (Doc. No. 133 ¶ 37.) The defendants base their statement on the plaintiff's deposition:

    Q.    Did he [defendant Nolte] have any reason to know that you had not been up in the ceiling previously when the other inmates were up there putting all of the boxes up there?

    A.    I can't say that he did.

(Doc. No. 117 ex. U p. 53.)  While it is technically correct that the plaintiff never made a statement in the form presented by the defendants, it is quibbling to interpret the

8

(Doc. No. 116 ¶ 37.) Consequently, the six
inmates  were placed on "strip cell status,"
during which the inmates were strip searched,
the cells were searched, and the inmates'
property was removed for verification of
ownership. (Doc. Nos. 114 ¶¶ 10 & 19 & 116 ¶¶
33-34.)  The defendants claim that Lieutenant
Hohney ordered the strip cell status, but the
plaintiff claims that corrections officers
told him that defendant DeRose ordered the
strip cell status. (Doc. Nos. 114 ¶ 19, 116 ¶
34, & 133 ¶ 34.)  Various contraband was
discovered in the cells. The corrections
officers continued to discover contraband
during the three shifts on February 12, 2004,
though the plaintiff denies this. (Doc. Nos.
114 ¶ 16, 116 ¶¶ 33 & 50-53, & 133 ¶¶ 33 &
50-54.) During the initial search on February
11, a ring, hidden in the plaintiff's shoe
tongue, was seized from him as contraband.
Defendant Nolte believed that the plaintiff
may have stolen the ring from an inmate
property box, although the plaintiff denies
this. In any case, the ring was contraband.
(Doc. Nos. 114 ¶¶ 10, 12, 14-15 & 116 ¶¶ 40-
44.) On February 12, according to the
defendants, they discovered razor blades in
the plaintiff's possession. The plaintiff
claims that he was framed because he and his
cell had been searched thrice earlier that
day, and on February 11, without any
contraband being discovered. (Doc. Nos. 114
¶¶ 36 & 37, 116 ¶ 53, & 133 ¶ 53.) He also
argues that he never possessed any stolen
property or contraband and any such items
found in his cell belonged to his cellmate.
(Doc. No. 114 ¶ 47.)

Strip search status was continued

_____

plaintiff's answer as narrowly as he does.
Indeed, the court notes that the plaintiff
frequently denies the defendants' statements
of fact not on the basis of clear factual
inaccuracy, but rather because he takes issue
with the defendants' manner of restating what
he said in his deposition.

through February 18, 2004. During that time,
the inmates and their cells were searched
each shift, thrice daily.  The inmates were
exteriorly strip searched. Because the
inmates did not receive recreational time
while on strip cell status, the plaintiff
contends that the continued strip searches at
a time when the inmates had no access to
contraband were undertaken solely to
humiliate and degrade the inmates, especially
himself in violation of Islamic tenets. The
defendants contend that the inmates in fact
had access to contraband, as shown by the
discoveries on February 12, as well as
additional discoveries on other inmates on
February 13, 14, 15, 17, and 18, therefore
warranting the strip searches. According to
the defendants, the inmates had access to
contraband when they received their meals and
medication and when they, including the
plaintiff, were taken to the medical unit;
the plaintiff denies the defendants' claims
because medical visits are always supervised.
(Doc. Nos. 114 ¶¶ 19, 44-45, & 60, 116
¶¶ 54, 60-69, 87, & 90, 124 ¶ 44, & 133 ¶¶
60-69, 87, & 90.)

The inmates' cells were also stripped of
various materials. According to the
defendants, pursuant to DCP policy, "inmates
on strip cell status are entitled to have in
their possession a mattress, blanket,
uniform, undergarments, socks, and shoes" and
are provided with toilet paper and personal
hygiene items on request. (Doc. Nos. 116 ¶¶
78 & 95 & 124 ¶ 35.)  Furthermore, according
to the defendants, the inmates' original
mattresses were seized on February 11 and
replaced with new mattresses the next
morning; new uniforms were also issued on
February 12. (Doc. No. 116 ¶¶ 82 & 89.) They
further state that, under the DCP's strip
cell policy, inmates may receive mail for a
short period of time to read it, but that the
mail is then stored with the inmate's writing
materials and personal belongings; an inmate
may not receive books or magazines. Inmates
are also not allowed possession of personal

10

hygiene items except upon request and for
immediate use. (Doc. No. 124 ¶ 35.)

According to the plaintiff, the
corrections officers seized everything,
including mattresses, blankets, clothing, and
personal hygiene items, and did not provide
access to mail, writing materials, the law
library, or showers. (Doc. Nos. 114 ¶¶ 19 &
35 & 133 ¶ 78.) He denies that the defendants
replaced the seized mattresses or issued new
uniforms. (Doc. No. 133 ¶¶ 82 & 89.)
Furthermore, according to the plaintiff, the
temperature in the shakedown unit was kept
very cold, which was exacerbated by the
plaintiff's lack of clothing and bedding and
led to his developing a cold. (Doc. No. 133
¶¶ 97, 99-100, & 108.) The plaintiff also
complains that his sink and toilet were
leaky. (Doc. No. 133 ¶¶ 101-104.) Together,
the conditions of his confinement led,
according to the plaintiff, to psychological
injury. (Doc. No. 133 ¶ 109.)

The defendants agree that the plaintiff
did not receive a shower because inmates in
the shakedown unit, who are allowed showers
every three days, take their showers during
recreational time, which, as noted above, was
discontinued during the strip cell status.
The defendants also note that there is no
evidence of an injury from the lack of a
shower and that the plaintiff had previously
refused scheduled showers. (Doc. Nos. 116 ¶¶
91-94 & 124 ¶ 32.)  They further note, based
on the maintenance logs, that no corrections
officer noticed any maintenance problem, such
as a leaking sink or toilet, in the
plaintiff's cell. (Doc. Nos. 116 ¶¶ 101-04 &
124 ¶ 35.) In addition, they contend that the
temperature in the shakedown unit ranged from
73 to 83 degrees and that there is no
evidence that the plaintiff suffered from a
cold because he never sought medical
treatment. (Doc. Nos. 116 ¶¶ 98-100 & 108 &
124 ¶ 35.) They contend that the plaintiff
also never sought treatment for the
psychological injury, which the plaintiff

11

concedes. (Doc. Nos. 116 ¶ 109 & 133 ¶ 109.)

In addition, the plaintiff complains that the shakedown unit was "over-run with vermin," which the defendants deny on the basis of bimonthly visits by an exterminator. (Doc. Nos. 114 ¶ 34, 116 ¶¶ 105-06, & 124 ¶ 34.) The plaintiff further complains that the defendants did not feed him for thirty-six hours, from sometime after 4:00 pm on February 11 until 4:10 am on February 13; the defendants deny the plaintiff's claim and argue that the cell block logs and Behavioral Adjustment Unit reports show that the plaintiff received his meals.  (Doc. Nos. 114 ¶ 30, 116 ¶ 90, & 124 ¶ 30.)

The defendants claim that Deputy Warden Carroll ordered the continuation of strip cell status and defendant DeRose did not learn of it until after the order was given; the plaintiff contends that several corrections officers told him that defendant DeRose ordered the continuation. (Doc. Nos. 114 ¶¶ 19 & 46, 116 ¶¶ 54-56 & 79-81, 124 ¶ 46, & 133 ¶¶ 55 & 79-81.)  According to the defendants, Deputy Warden Carroll ordered the strip cell status because she feared that the inmates might have modified or tampered with the shakedown unit so as to conceal additional contraband; she also wanted to ensure the inmates' and the corrections officers' safety and DCP's security. (Doc. No. 116 ¶¶ 57-59.) The plaintiff denies the averments and contends instead that the strip cell status was meant to "degrade, dehumanize and punish the Shakedown inmates." (Doc. No. 133 ¶¶ 57-59.)

According to the defendants, on February 13, a new inmate was moved into the plaintiff's cell. The next day, the new inmate told defendant Bishop that the plaintiff and other inmates planned to escape by climbing into the ceiling cavity and to the roof. (Doc. No. 116 ¶¶ 72-74.) The plaintiff denies that he planned an escape. (Doc. No. 133 ¶¶ 73-74.) The defendants

12

contend that, on the basis of this information, they continued strip cell status until the inmates could be securely and safely relocated. (Doc. No. 116 ¶¶ 75-76.) The plaintiff denies this. (Doc. No. 133 ¶¶ 75-76.)

On the basis of the incident concerning the ceiling cavity, defendant Nolte charged the six inmates, including the plaintiff, with ten violations: theft; possession of contraband; destroying, altering, tampering with, or damaging the county's or another's property; disruptive behavior or interference with the security of or orderly running of the prison; refusing to obey an oral or written order; presence in an unauthorized area; violation of administrative directives; conspiracy to commit misconduct; and, failure to report the presence of contraband. (Doc. Nos. 114 ¶ 16 & 116 ¶ 38.) On the basis of the discovery of the ring, defendant Nolte charged the plaintiff with seven violations: theft; possession of contraband; interference with the security of or orderly running of the prison; violation of administrative directives; conspiracy to commit misconduct; and, failure to report the presence of contraband. (Doc. No. 116 ¶ 47.) Both incident reports were delivered to the plaintiff by Corrections Officer Tracy Yohn around 1:00 o'clock on the morning of February 12. (Doc. No. 116 ¶¶ 39 & 48.)

On February 13, defendant Bishop presided over a hearing with two other officers to adjudicate the two misconduct reports against the plaintiff. (Doc. Nos. 114 ¶ 20 & 116 ¶¶ 110-111 & 118.) Before February 13, the hearing board reviewed a report of extraordinary occurrence written by a DCP lieutenant, to which were attached memorandums by four corrections officers, including defendants Nolte and Hill, concerning the February 11 ceiling cavity incident and photographs of the seized contraband, as well as defendant Nolte's February 11 incident reports on the ring

13

incident concerning the plaintiff. (Doc. No. 116 ¶¶ 144-45 & 174.) The incident reports indicated that the plaintiff had been given a copy of the incident reports by Corrections Officer Yohn in the early morning of February 12. (Doc. No. 116 ¶¶ 146 & 175.) At that time, the plaintiff never requested any witnesses and waived his right to representation at his hearing; the plaintiff's waiver is reflected in two disciplinary report forms. (Doc. Nos. 116 ¶ 150-52 & 124 ¶ 20.)

At the hearing, the plaintiff signed the notice of his rights, which includes the right to have a representative and to call witnesses. (Doc. No. 116 ¶¶ 148-49 & 177.) The board recognized that the plaintiff had been informed of his right to and declined to have any witnesses or a representative. (Doc. No. 116 ¶¶ 152 & 178.) The plaintiff signed the DCP disciplinary report, indicating that he was informed of the charges, chose not to have a representative, and pled not guilty to all the charges. (Doc. No. 116 ¶¶ 153-54.) The plaintiff made a statement to the board in which he denied knowledge of the ceiling cavity incident and claimed the ring was his property, which he had hidden in his shoe to prevent its theft. (Doc. No. 116 ¶¶ 155 & 179.)

The board unanimously found the plaintiff guilty of all the charges in both misconducts on the basis of the extraordinary occurrence report and its attachments, as well as defendant Nolte's report. They also considered the statements of the other shakedown inmates in their hearings, which were conducted the same day. (Doc. Nos. 114 ¶ 21, 116 ¶ 156, 158, & 180-81, & 124 ¶¶ 21 & 28.) With respect to the ceiling cavity incident, the board found the plaintiff's statement to be incredible because the ring had been found in his shoe. They also found that the plaintiff's presence outside his cell when defendant Nolte discovered the inmates in the ceiling cavity to be

14

significant because of the layout of the
shakedown unit. (Doc. No. 116 ¶¶ 159-60.) On
the misconduct arising out of the theft of
the inmate property boxes, the plaintiff was
sentenced to 120 days' lock-in on all ten
charges and loss of good-time credit. (Doc.
Nos. 114 ¶ 24 & 116 ¶¶ 162-169.) On the
misconduct  arising out of the contraband
ring, the plaintiff was sentenced to ninety
days' lock-in on all seven charges and loss
of good-time credit. (Doc. No. 116 ¶¶ 182-
184.) The DCP major and a deputy warden
reviewed and approved the plaintiff's
convictions and sentences. (Doc. No. 116 ¶¶
170-71 & 185-86.) According to the
defendants, the sentences accorded with DCP
policy based on the plaintiff's prior
offenses and the severity of the current
offenses. Prior to the February 13 hearing,
the plaintiff had been convicted of two class
one, level one convictions and one class one,
level three conviction. On the property box
incident, the plaintiff was convicted of two
class one, level one charges; one class one,
level two charge; and, seven class one, level
three charges. On the basis of the
plaintiff's third class one, level one
conviction, the sentencing guidelines called
for, and the board applied, the 120 days'
lock-in. On the ring incident, the plaintiff
was convicted of two class one, level one
offenses and five class one, level three
offenses. Under the sentencing guidelines,
the plaintiff was properly sentenced to 90
days' lock-in. (Doc. No. 116 ¶¶ 164-171 &
180-86.)

In contrast, the plaintiff offers a
different version of events: Prior to the
hearing, the plaintiff contends that he was
never asked whether he wanted any witnesses
or a representative or to sign any notice of
the hearing. He denies that Corrections
Officer Yohn read the charges to him. (Doc.
No. 133 ¶¶ 123-27, 134, & 178.) He contends
that the panel never reviewed the
extraordinary occurrence report. (Doc. No.
133 ¶ 144.) At the hearing, the plaintiff

admits that he signed the DCP disciplinary
report, but contends he did so only to
commence the proceedings and to show that he
knew the charges, pled not guilty, and
represented himself, not that he did not want
a representative. (Doc. No. 133 ¶ 1454.) He
contends that he was not allowed to "offer
any exculpatory evidence . . . , but was only
asked to 'tell' (inform) on inmates who were
truly involved in 2/11/04 Shakedown
incident." (Doc. No. 114 ¶ 22.) He denies
making the statements the defendants proffer,
instead arguing that he remained in his cell
during the ceiling cavity incident and that
the ring was his property. (Doc. No. 133 ¶¶
155, 159, & 179.)

According to the plaintiff, defendant
Bishop refused to allow him to call any
witnesses or to have representation and there
is no evidence that he ever agreed to waive
his rights. (Doc. No. 114 ¶ 20.) Also,
defendant Bishop never deliberated or
consulted with the other panelists, but
instead found the plaintiff guilty and
sentenced him upon the conclusion of the
hearing. (Doc. No. 133 ¶¶ 135 & 181.) Nor
could defendant Bishop have relied on the
other inmates' statements because the
plaintiff's hearing was first. (Doc. No. 133
No. 156.) The plaintiff claims that
"Defendant Bishop never gave a reason for
the action taken against" him—the conviction
and the punishment—and that there was
insufficient evidence to support a guilty
finding. (Doc. Nos. 114 ¶¶ 27 & 28 & 133 ¶¶
136 & 180.) He also argues that his sentence
was inappropriately calculated because he did
not have the prior convictions that the
defendants claim and the classification and
sentences for the February 13 convictions
were incorrect. (Doc. No. 133 ¶¶ 136, 138,
164-71, & 180-86.) After the hearing, the
plaintiff contends that the DCP major and
deputy warden could not have reviewed the
sentence because it was improper.

(Doc. No. 133 ¶¶ 140, 171, & 185-86.)

16

## II.   DISCUSSION

### A.   SUMMARY JUDGMENT STANDARD

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *See Knabe v. Boury*, 114 F.3d 407, 410 n.4 (3d Cir. 1997)(citing Fed. R. Civ. P. 56(c)). "[T]his standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

A fact is "material" if proof of its existence or nonexistence would affect the outcome of the lawsuit under the law applicable to the case. *Id.* at 248; *Levendos v. Stern Entertainment Inc.*, 860 F.2d 1227, 1233 (3d Cir. 1988). An issue of material fact is "genuine" if the evidence is such that a reasonable jury might return a verdict for the non-moving party. *Anderson*, 477 U.S. at 257. In determining whether a genuine issue of fact exists, a court must resolve all factual doubts and draw all reasonable inferences in favor of the nonmoving party. *Conoshenti v. Public Serv. Elec. & Gas Co.*, 364 F.3d 135, 140 (3d Cir. 2004) (citation omitted).

The initial burden is on the moving party to show an absence

of a genuine issue of material fact. The moving party may meet this burden by "pointing out to the district court [] that there is an absence of evidence to support the nonmoving party's case when the nonmoving party bears the ultimate burden of proof." *Celotex*, 477 U.S. at 325. The non-moving party may not rest on the bare allegations contained in his or her pleadings, but is required by Federal Rule of Civil Procedure 56(e) to go beyond the pleadings by way of affidavits, depositions, answers to interrogatories or the like in order to demonstrate specific material facts which give rise to a genuine issue. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). When Rule 56(e) shifts the burden of proof to the non-moving party, that party must produce evidence to show the existence of every element essential to its case which it bears the burden of proving at trial. *Equimark Commercial Finance Co. v. C.I.T. Financial Services Corp.*, 812 F.2d 141, 144 (3d Cir. 1987).

"In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of evidence." *Anderson*, 477 U.S. at 255. Therefore, when evidentiary facts are in dispute, when the credibility of witnesses may be in issue, or when conflicting evidence must be weighed, a full trial is usually necessary.

B.   **PLAINTIFF'S OBJECTIONS**[3]

In considering this case and all its ramifications, certain general principles applicable to cases filed by inmates guide our analysis.  While citation to and application of relevant legal authority will be set out in detail below, here we establish the broad framework within which specific issues are discussed.

When a citizen is committed to or detained in prison, he retains many of the legal and constitutional rights of a free citizen.  However, an inmate's ability to exercise and take advantage of these rights and privileges are oftentimes much different from free society.  Prison society is much different from the free society of the community at large and there are always severe tensions between the officials and the inmates committed or detained in prison.

Within the prison setting there is always a serious need to maintain security for the staff, the inmates, and all the citizens of the surrounding community.

Security matters within a prison are not always amenable to easy solutions or quick answers.  The nature of a problem may

---

[3] To the extent Plaintiff's Objection to the Report and Recommendation addresses prior decisions by the Magistrate Judge, we consider such material procedural background and not substantively before the Court.  (*See* Doc. 148 at 2-9.)  Further, to the extent Plaintiff raises collateral estoppel and res judicata issues (*see*, *e.g.*, Doc. 148 at 5, 6, 15, 16), based on the Court's this Court's previous Memorandum and Order (Doc. 70) made clear that a renewed motion for summary judgment may be appropriate (Doc. 70 at 53 n.15).

require a specific length of time to transpire for officials to sense, understand and correct the situation.  Courts must acknowledge and be aware of the fact that we must often cede to prison administrators a more extensive knowledge of what needs to be done in particular circumstances.

We must always consider the general conduct of prison authorities when we are faced with problems similar to those presented here.  In this case, all of the parties - Plaintiff and Defendants - describe a rather bizarre set of circumstances regarding the incident underlying the claims at issue in this Memorandum: apparently items were allegedly stolen and stacked in a ceiling cavity, and the conduct of the inmates in that area created an obvious threat to the security of the institution.  Thus, only the most serious approach to understanding and resolving that type of problem could possibly be entertained by the members of the staff.

### 1.   LIABILITY UNDER 42 U.S.C. § 1983 OF DEFENDANT DEROSE

Plaintiff asserts the Magistrate Judge erred in his conclusion that Plaintiff has not provided sufficient evidence of personal involvement to survive Defendant's Motion for Summary Judgment under any remaining claim.  (Doc. 148 at 9.)  Plaintiff supports this argument with portions of his deposition (Doc. 117, Ex. U at 80-81, 87-88).  (Doc. 148 at 9-11.)  Additionally, Plaintiff alleges Defendant's reliance on the affidavits of Defendant DeRose

(Doc. 137, Ex. A) and DCP Deputy Warden Leonard Carroll (Doc. 137, Ex. T) are insufficient to support the recommendation for summary judgment as to all remaining claims against Defendant DeRose. (Doc. 148 at 9-11).

Section 1983 creates no substantive rights, but rather allows a plaintiff to vindicate violations of rights created by the United States Constitution or federal law. *Baker v. McCollan*, 443 U.S. 137, 145 n.3 (1979); *Kaucher v. County of Bucks*, 455 F.3d 418, 423 (3d Cir. 2006). To state a claim under § 1983, the plaintiff must show the defendant, acting under color of state law, deprived him of a right secured by the Constitution or laws of the United States. 42 U.S.C. § 1983; *American Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 49-50 (1999); *Kaucher*, 455 F.3d at 423. Liability under § 1983 is personal in nature and a defendant is liable only if he was personally, affirmatively involved in the alleged wrongdoing. *Robinson v. City of Pittsburgh*, 120 F.3d 1286, 1294 (3d Cir. 1997), *abrogated in part on other grounds by Burlington N. & Santa Fe Ry. Co. v. White*, -U.S.-, 126 S.Ct. 2405 (2006) (*citing Rhode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988); *Andrews v. City of Philadelphia*, 895 F.2d 1469, 1478 (3d Cir. 1990)). A defendant who supervised the wrongdoer but did not personally participate in the wrongful act is not liable under § 1983 on a theory of *respondeat superior* unless he personally directed or had actual knowledge of, and acquiesced in, the

deprivation.  *Polk County v. Dodson*, 454 U.S. 312, 325 (1981) (*citing Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978)); *Robinson*, 120 F.3d at 1294.  A defendant who lacked any supervisory power over the wrongdoer and who was not personally, affirmatively involved in the alleged wrongful conduct is not liable under § 1983.  *Robinson*, 120 F.3d at 1294.

Here, the Magistrate Judge concluded Plaintiff had not produced any evidence of Defendant DeRose's personal involvement in conduct underlying Plaintiff's remaining claims against him – Plaintiff's Fourth Amendment strip search claim and Fourteenth Amendment conditions of confinement claim.  (Doc. 147 at 25.) Thus, Magistrate Mannion recommended summary judgment be granted as to the remaining claims against Defendant DeRose and Plaintiff's Complaint be dismissed as to Defendant DeRose.  (Doc. 147 at 26.) Notwithstanding this recommendation, the Magistrate Judge proceeded with a substantive analysis of Defendant's Motion for Summary Judgment regarding Plaintiff's remaining claims against Defendants DeRose, Bishop, and Nolte.  (Doc. 147 at 26.)

We disagree with the recommendation that summary judgment is appropriate as to Defendant DeRose based upon a lack of evidence supporting Defendant DeRose's personal involvement in the conduct underlying Plaintiff's claims.  In supporting his recommendation, the Magistrate Judge discuses the affidavits of Defendant DeRose and other prison officials as substantiating Defendant DeRose's

22

lack of involvement.  (Doc. 147 at 25.)

We note Defendant DeRose is the warden of DCP presumably with supervisory power of all DCP prison officials.  *See Dodson*, 454 U.S. at 325 (*citing Monell*, 436 U.S. at 694); *see also Robinson*, 120 F.3d at 1294.  Additionally, Defendant DeRose in his affidavit indicates he first learned of the strip cell status and inmate searches after Deputy Warden Carroll issued the order.  (Doc. 117, Ex. A at 6-7.)  Defendant DeRose's affidavit is silent on exactly when he learned of the order.  The critical question remains as to whether Defendant DeRose knew of and acquiesced to the order while the conditions complained of were continuing.  *See Dodson*, 454 U.S. at 325 (*citing Monell*, 436 U.S. at 694); *see also Robinson*, 120 F.3d at 1294.  Because Defendants have not carried their burden to demonstrate the absence of a genuine issue of material fact on the question of Defendant DeRose's personal involvement, summary judgment is inappropriate on this basis.

Our determination that Defendants have not satisfied their burden as to Defendant DeRose's personal involvement does not mean the claims are not subject to summary judgment based on substantive grounds discussed later in this Memorandum.

**2.   FOURTH AMENDMENT STRIP SEARCH ALLEGATION AGAINST DEFENDANT DEROSE**

Plaintiff takes exception to the Magistrate Judge's recommendation the strip searches of Plaintiff from February 11 through 18, 2004, were reasonable and present no genuine issue of

material fact.  (Doc. 148 at 11-15.)  According to Plaintiff, his previous filings and deposition support a contrary determination. (Doc. 148 at 11-15.)  Plaintiff disputes the factual accuracy of Defendants' offered justification that the searches were in response to an escape attempt or due to the continuing discovery of weapons and contraband.  (*Id.*)  Also, Plaintiff asserts because the searches were mostly cavity searches performed in front of other inmates and seemingly amused the officers, the scope and location of the searches do not satisfy the test in *Bell v. Wolfish*, 441 U.S. 520, 559 (1979).  (*Id.*)

The applicability of the Fourth Amendment "turns on whether the person invoking its protection can claim a justifiable, a reasonable, or a legitimate expectation of privacy that has been invaded by government action." *Hudson v. Palmer*, 468 U.S. 517, 525 (1984) (citation and internal quotation omitted).

Convicted prisoners confined in prison do not forfeit all constitutional protections.  *Bell*, 441 U.S. at 545.  Retention of certain constitutional rights by prison inmates does not preclude restriction and limitation of those rights.  *Id.* at 545-46. "[M]aintaining institutional security and preserving internal order and discipline are essential goals that may require limitation or retraction of the retained constitutional rights of both convicted prisoners and pretrial detainees." *Id.* at 546.  Prison officials are entitled to wide-ranging deference in implementing these

24

recognized essential penological interests.  *Bell*, 441 U.S. at 547.

> [T]he problems that arise in the day-to-
> day operation of a corrections facility are
> not susceptible of easy solutions.  Prison
> administrators therefore should be accorded
> wide-ranging deference in the adoption and
> execution of policies and practices that in
> their judgment are needed to preserve
> internal order and discipline and to maintain
> institutional security

*Id.*

Bodily strip searches are not categorically eliminated from Fourth Amendment protection.  *Bell*, 441 U.S. at 558-59.  The reasonableness of the search is the critical factor in determining whether a Fourth Amendment violation has occurred.  *Id*.  *Bell* set out the proper test:

> The test of reasonableness under the
> Fourth Amendment is not capable of precise
> definition or mechanical application.  In
> each case it requires a balancing of the need
> for the particular search against the
> invasion of personal rights that the search
> entails.  Courts must consider the scope of
> the particular intrusion, the manner in which
> it is conducted, the justification for
> initiating it, and the place in which it is
> conducted.

*Bell*, 441 U.S. at 559.

Here, the Magistrate Judge concluded no genuine issue of material fact existed as to the reasonableness of the strip searches conducted in the shakedown unit from February 11 through 18, 2004.  (Doc. 147 at 26-30.)  Pursuant to *Bell*, he determined the justification, scope, and manner of the searches were

reasonable when balanced against the invasion of Plaintiff's personal rights.  (Doc. 147 at 26-30.) (*citing Bell*, 441 U.S. at 559).

We agree with the Magistrate Judge and find that the searches were reasonable under the standard of *Bell*.  *See id.*  First, the Defendants asserted and the Magistrate Judge considered the justification of institutional security and safety of the inmates and staff for the searches.  (Doc. 147 at 28-29.)  The record in this matter establishes the discovery of stolen property and contraband secreted in the shakedown unit where Plaintiff was lodged on February 11, 2004.  (Docs. 117 Exs. B, B-1, B-5.)  The items discovered included twenty-two (22) boxes of suspected stolen inmate property hidden in the ceiling of the unit.  *Id.* Additionally, among the items were sharpened metal objects referred to as "shanks" which could be used as dangerous weapons.  *Id.*  A subsequent strip search of Plaintiff revealed contraband – Plaintiff admits that a ring was hidden in the tongue of his shoe.[4] Also on February 12, 2004, on various shifts in the shakedown unit officers discovered two (2) radios and prohibited toiletry items. (Doc. 117 Ex. T.)  On February 13, 2004, Defendant Bishop received information from another inmate that inmates in the shakedown unit

---

[4] Plaintiff disputes that razor blades were found hidden in the tongue of his shoe as Defendants allege.  Because contraband was undisputedly found in the form of the ring, whether additional contraband was found is not material.

where Plaintiff was lodged had discussed an escape plan.  (Doc. 117 Ex. C.)  Considering the concerns for the security of DCP and safety of staff and inmates and the deference prison administrators receive in these areas, the justification for the ordered strip searches of the shakedown unit from February 12 through 18, 2004, weighs in favor of finding the searches were reasonable.  *See Bell*, 441 U.S. at 548, 559.

Second, the scope of the searches consisted of a search of the shakedown unit inmates' bodies once per shift with three (3) shifts each day.  (Doc. 117.)  DCP administrators assert that a strip search was necessary because inmates intending to hide contraband and weapons will secret the prohibited items on their person or in a body cavity if only a search of the cell is ordered.  (Doc. 117 Ex. T.)  Additionally, prison administrators allege shakedown unit inmates receive meal trays and medicine from outside the unit, thus they have regular contact and opportunity for obtaining prohibited material.  (Doc. 117.)  We note the record also establishes that shakedown inmates are lodged two (2) inmates per cell.  (Doc. 117.)  Also, we note the record establishes the searches were conducted for a limited period – seven (7) days from February 11 through 18, 2004.  (*Id.*)  We find in consideration of the deference due prison administrators in this area the scope of the searches weighs in favor of a finding of reasonableness.  *See Bell*, 441 U.S. at 548, 559.

Third, the manner of the searches consisted of non-cavity views of the naked inmate.  (Doc. 117.)  Although Plaintiff asserts most of the searches were cavity searches and looks to his deposition to support this assertion (Doc. 117 Ex. U at 89), Plaintiff's testimony in the referenced document clearly stated: "He would make me pull my underwear down.  He wouldn't make me expose my anus to them like the other ones." (*Id.*)  Contrary to Plaintiff's allegation that the searches were mostly cavity searches, Plaintiff's own testimony demonstrates the searches consisted of a view of the exterior of Plaintiff's body and was not invasive in the sense of physical contact with the interior cavities of Plaintiff's body.  Additionally, the searches were conducted in the inmate's cell.  (*Id.*)  We find the manner of the search weighs in favor of a finding of reasonableness.  *See Bell*, 441 U.S. at 548, 559.

Given the deference DCP prison administrators are entitled and the justification, scope, and manner of the searches as balanced against any invasion Plaintiff's rights, we find the strip searches of Plaintiff between February 11 through 18, 2004, were reasonable and were not violative of the Fourth Amendment.  *See Bell*, 441 U.S. at 548, 559.  Moreover, we find Defendants have carried their burden that no genuine issue of material fact exists in regard to the reasonableness of the strip searches.  Therefore, we adopt the Magistrate Judge's Report and Recommendation in this respect and

28

grant Defendants' Motion for Summary Judgment (Doc. 115) on this issue.[5]

### 3.   FOURTEENTH AMENDMENT CONDITIONS OF CONFINEMENT CLAIM AGAINST DEFENDANT DEROSE

Plaintiff objects to the recommendation that summary judgment be granted because the conditions of Plaintiff's confinement did not violate the Fourteenth Amendment.  (Doc. 148 at 15-20.) Plaintiff asserts the conditions included not removing Plaintiff from the shakedown unit sooner, lack of recreation time, Plaintiff's cell was overrun with vermin, Plaintiff was not treated for a cold, Plaintiff was not permitted to see the prison psychiatrist, Plaintiff did not receive food trays, Plaintiff's cell temperature was too cold, Plaintiff was denied hygiene items during strip cell status, Plaintiff's toilet leaked, and the prison lacked justification for the strip cell status.  (*Id.*)

The assessment of the constitutionality of conditions imposed on a pretrial detainee is properly evaluated pursuant to the Due Process Clause of the Fourteenth Amendment.  *Bell*, 441 at 536-37. Central to the inquiry is whether the conditions amount to punishment.  *Id.* at 536.   The Court in *Bell* stated:

> A court must decide whether the disability is imposed for the purpose of punishment or whether it is but an incident

_____

[5] Although Defendants argue in the alternative they should prevail on this issue because Plaintiff failed to exhaust administrative remedies (Doc. 153 at 12), given our disposition of this issue on the merits we do not address this argument.

29

> of some other legitimate government purpose.
> Absent a showing of an expressed intent to
> punish on the part of detention facility
> officials, that determination will turn on
> whether an alternative to which the
> restriction may rationally be connected is
> assignable to it.  Thus, if a particular
> condition or restriction of pretrial
> detention is reasonably related to a
> legitimate governmental objective, it does
> not, without more, amount to punishment.

*Bell*, 441 at 538-39 (internal quotations and citations omitted).

The *Bell* Court further stated:

> In determining whether conditions or
> restrictions are reasonably related to the
> Government's interest in maintaining security
> and order and operating the institution in a
> manageable fashion, courts must heed our
> warning that such considerations are
> peculiarly within the province and
> professional expertise of corrections
> officials, and, in the absence of substantial
> evidence in the record to indicate that the
> officials have exaggerated their response to
> these considerations, courts should
> ordinarily defer to their expert judgment in
> such matters.

*Id.* at 540 n.23 (internal quotations and citations omitted).  Our

Third Circuit has distilled the teachings of *Bell* down to a two (2)

step process:

> [W]e must ask, first whether any
> legitimate purposes are served by these
> conditions, and second, whether the
> conditions are rationally related to these
> purposes.  In assessing whether the
> conditions are reasonably related to the
> assigned purposes, we must further inquire as
> to whether these conditions cause inmates to
> endure such genuine privations and hardship
> over an extended period of time, that the
> adverse conditions become excessive in

> relation to the purposes assigned to them.
> Our inquiry into whether given conditions
> constitute punishment must therefore consider
> the totality of circumstances within the
> institution.

*Hubbard v. Taylor*, 399 F.3d 150, 159-60 (3d Cir. 2005) (internal
quotations and citations omitted).

The Magistrate Judge, pursuant to *Bell* and *Hubbard*, concluded,
to the extent the evidence supports a finding the conditions
existed, the conditions complained of were rationally related to a
legitimate purpose. (Doc. 148 at 15-20.) Magistrate Judge Mannion
determined the evidence supports a finding that Plaintiff retained
his bedding and uniform, his cell temperature was temperate, the
cell was not infested with vermin, and the toilet did not leak.
(*Id.*) In determining whether the conditions were rationally
related to a legitimate purpose, Magistrate Judge Mannion concluded
the conditions did not cause Plaintiff to endure such genuine
privations and hardships over an extended period of time that the
conditions became excessive in relation to the legitimate purposes
assigned to them. (*Id.*) He also determined Defendants'
justification of maintaining order and security for the strip cell
status was legitimate given the discovery of contraband including
dangerous weapons and the information regarding a potential escape
plan by inmates in the shakedown unit. (*Id.*) Additionally,
Magistrate Judge Mannion observed the conditions of strip cell
status were endured by Plaintiff for only one (1) week from

February 11 through 18, 2004.  (Doc. 148 at 15-20.)  Moreover, he observed the lack of evidence for any inference that the conditions were for a punitive purpose.  (*Id.*)  Thus, Magistrate Judge Mannion recommends summary judgment be granted on this issue.  (*Id.*)

We agree with the Magistrate Judge that the conditions complained of do not rise to the level of a constitutional violation.  As previously discussed in regard to Plaintiff's Fourth Amendment claim above, DCP officials discovered contraband including dangerous weapons in the shakedown unit.  (Docs. 117 Exs. B, B-1, B-5.)  Additionally, prison administrators received information inmates in the shakedown unit were planning to escape. (Doc. 117 Ex. C.)  Considering the deference entitled to prison administrators, we find Defendants had a legitimate interest in maintaining security and order within DCP.  *See Bell*, 441 U.S. at 540.

Considering the legitimate interest of security and order, we cannot say any of the conditions Plaintiff asserts imposed such a hardship and were over such an excessive time period to amount to punishment.  *See Bell*, 441 U.S. at 540; *see also Hubbard*, 399 F.3d at 159-60.  The record establishes the strip cell status was ordered to prevent inmates from possessing or obtaining contraband or weapons.  (Doc. 117 Ex. A.)  Plaintiff was permitted to keep his uniform, a blanket, and his mattress.  (*Id.*)  Additionally, the record establishes the temperature for the week of February 11

through 18, 2004, ranged from 73 to 82 degrees Fahrenheit.  (Doc.
117 Ex. A.)  DCP also employed an independent contractor to conduct
pest control in the months preceding February 11, 2004.  (*Id.*)
According to documents submitted by Defendants, meal trays were
delivered to the cell block for each meal.  (*Id.*)  The record
indicates Plaintiff was removed from the shakedown unit on February
18, 2004.  (*Id.*)  The entire length of time Plaintiff was in the
shakedown unit was the seven (7) day period from February 11
through 18, 2004.  (*Id.*)  Although Plaintiff asserts the inmates in
the shakedown unit were not permitted to shower or have recreation
time while he was lodged there, we cannot say such deprivation for
the limited period of one (1) week under the totality of the
circumstances amounts to punishment.[6]

Similarly, we find without merit Plaintiff's assertion that he
and all the shakedown inmates could have been moved out of the
shakedown unit sooner and the fact they were not shows the punitive
nature of the conditions (Doc. 148 at 15-16).  In general, the
shakedown unit was a more secure protective custody area than the
restrictive housing unit; at the time of the incident, the unit was
used for "extreme protective custody."  (Doc. 116 ¶ 9.)  Defendants
aver "[b]ecause all inmates housed in Shakedown were on
disciplinary restriction and in protective custody, they could not

---

[6] Plaintiff asserts no evidence regarding these matters other
than his contradiction of Defendants' submissions.

be relocated until their files were reviewed and appropriately secure and safe alternative housing location could be selected for each individual inmate." (Doc. 116 ¶ 76.) Plaintiff denies this assertion, but only on the basis that he cannot admit to the prison officials' states of mind. (Doc. 133 ¶ 76.)

Based on the type of inmate housed in the shakedown unit and the practical considerations attendant to moving such inmates, we conclude that a reasonable factfinder could not find the period of time the inmates were kept in the unit following the incident to be punitive. Prison officials had a legitimate purpose for not moving the inmates sooner – the secure and safe relocation of the inmates. Keeping the inmates in the shakedown unit was clearly related to the safe and secure relocation. Further evidence of the need for protection considerations can be seen in the fact that Plaintiff was moved to the unit because he feared for his life. (Doc. 114 ¶¶ 4, 6; Doc. 116 ¶¶ 7-9.) Evidence of prison officials' consistent concerns for protection of shakedown inmates can be seen in Deputy Warden Nichols's response on February 8, 2004, to Plaintiff's request to be moved out of the shakedown unit: since Plaintiff was moved there because he was in fear his life was endangered, she wanted to know what had changed. (*See*, *e.g.*, Doc. 51 Ex. B.)

Plaintiff's claims that he was not treated for a cold, was prevented from getting a prison psychiatrist to witness his confinement condition and was prevented from receiving

psychological assessment and treatment are similarly without merit. (*See* Doc. 148 at 16-17.)  Plaintiff does not present any facts to indicate these asserted deprivations were punitive.

From this record and the deference entitled to Defendants, we find the conditions Plaintiff asserts, individually or in sum, do not amount to punishment in violation of the Fourteenth Amendment. *See Bell*, 441 U.S. at 540; *see also Hubbard*, 399 F.3d at 159-60. Given the lack of a genuine issue of material fact, we find summary judgment is appropriate as to this issue.[7]

### 4.   FOURTEENTH AMENDMENT DUE PROCESS CLAIM REGARDING RECREATION TIME AGAINST DEFENDANT NOLTE

Plaintiff objects to the recommendation that summary judgment be granted as to Defendant Nolte because his release of six (6) shakedown inmates together was not a violation of the constitution. (Doc. 148 at 20-22.)  Plaintiff asserts the Magistrate Judge failed to consider the seriousness of releasing inmates from the shakedown unit when determining whether Defendant Nolte was deliberately indifferent to a serious risk of harm.  (*Id.*)

The submissions of the parties, the Magistrate Judge's report, and our independent research do not reveal a Supreme Court or Third Circuit case directly on point with the factual situation presented here, i.e., a pretrial detainee alleging a constitutional violation

---

[7] Although Defendants argue in the alternative they should prevail on this issue because Plaintiff failed to exhaust administrative remedies (Doc. 153 at 18), given our disposition of this issue on the merits we do not reach that argument.

for prison staff failing to adequately provide for his safety from threat of assault by other inmates.  Thus, we look to cases sufficiently analogous for guidance in determining the proper constitutional standard to apply.

An allegation that a prison official has not protected an inmate from a risk of harm is considered a condition of confinement claim.  *See*, *e.g.*, *Farmer v. Brennan*, 511 U.S. 825, 837 (1994).  For a convicted inmate, such an allegation is analyzed under the Eighth Amendment.  *Id.*  However, condition of confinement claims brought by a pretrial detainee in a state or county facility are considered under the Fourteenth Amendment Due Process Clause.  *See*, *e.g.*, *Hubbard*, 399 F.3d 150.

As recognized in *Hubbard*, and discussed above, the United States Supreme Court set out the test to be applied to whether a condition of confinement violates a pretrial detainee's constitutional rights in *Bell v. Wolfish*, 441 U.S. 520 (1979).  Because a pretrial detainee may not be subject to punishment, the test is wether the challenged conditions amount to punishment – an inquiry which generally turns on whether the conditions have an alternative legitimate purpose and whether the conditions are rationally related to that purpose.  *Hubbard*, 399 F.3d at 158-60 (*citing Bell*, 441 U.S. at 538-39).  The rational relationship consideration looks at whether the condition complained of is excessive in relation to the legitimate purpose.  *Id.*  The analysis

36

of whether given conditions constitute punishment must consider the totality of circumstances within the institution. *Hubbard*, 399 F.3d at 160.

Additionally, prison administrators are entitled to deference in absence of substantial evidence in the record that administrators have exaggerated their response to considerations within their expertise such as maintaining institutional security and order. *Bell*, 441 U.S. at 540 n.23 (internal quotations and citations omitted). Citing Bell, Hubbard explained "the effective management of the detention facility . . . is a valid objective that may justify imposition of conditions and restrictions of pretrial confinement and dispel any inference that such restrictions are intended as punishment." *Hubbard*, 399 F.3d at 159 (*citing* Bell 511 U.S. at 540).

In *Bell* the Court also explained that "pretrial detainees, who have not been convicted of any crimes, retain at least those constitutional rights that we have held are enjoyed by convicted prisoners." *Bell*, 441 U.S. at 545. *Hubbard* noted that cases within the Third Circuit, though not always perfectly clear, pursuant to *Bell* have consistently considered Eighth Amendment protections a floor for a pretrial detainee's condition of confinement claims. *Hubbard*, 399 F.3d at 165-66.

Courts considering a pretrial detainee's claim that prison officials did not adequately protect him from harm by other inmates

37

have also applied the Eighth Amendment analysis set out in *Farmer v. Brennan*, 511 U.S. at 834. *See*, *e.g.*, *Fisher v. Lovejoy*, 414 F.3d 659, 661-62 (7th Cir. 2005). Given *Hubbard's* directive that the Eight Amendment provides a floor for the due process inquiry, 399 F.3d at 165-66, an Eighth Amendment failure to protect analysis is relevant here and establishes the minimum protection to which a pretrial detainee is entitled.

The Supreme Court recognizes the Eighth Amendment requires that "prison officials have a duty to protect prisoners from violence at the hands of other prisoners." *Farmer*, 511 U.S. at 833 (citation omitted). A prison official violates the Eighth Amendment when two requirements are met: 1) the deprivation is objectively sufficiently serious; and 2) the prison official was "deliberately indifferent" to the inmate's health or safety. *Id.* at 834. The Court went on to explain the "deliberate indifference" standard in the context of an Eighth Amendment denial of humane conditions claim.

> [A] prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference. . . . . . [A]n official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment.

*Farmer*, 511 U.S. at 837-38.

In *Helling v. McKinney*, 509 U.S. 25, 33 (1993), the Court noted that an Eighth Amendment remedy for unsafe conditions "need not await a tragic event." The Court cited with approval a Tenth Circuit case in which the court held a prisoner need not wait until he is actually assaulted before obtaining relief. *Id.* at 34. These cases establish the viability of a future-risk claim, instructing the inmate must show an unreasonable risk of serious damage to his future safety. *See, e.g., Chandler v. Crosby*, 379 F.3d 1278, 1289 (11th Cir. 2004).

Here the record establishes on February 11, 2004, Defendant Nolte released the inmates in the shakedown unit together at the inmates' request. (Docs. 114 at ¶ 7, 116 at ¶ 22.) The record further reflects Defendant Nolte was suspicious of the inmates' request. (Doc. 116 at ¶ 24.) Additionally, Defendant Nolte acquiesced to the request to determine the nature of the inmates' true intentions. (*Id.*) Defendant Nolte had no reason to believe Plaintiff was in danger from being released for recreation with the other inmates. (*Id.* at ¶ 25.) Further, Defendant Nolte discovered two (2) inmates in the ceiling cavity of the shakedown unit and secured the inmates in their cells. (Docs. 114 at ¶ 8, 116 at ¶ 31.) Subsequently, Defendant Nolte located twenty-two (22) stolen inmate property boxes containing various items including dangerous weapons. (Docs. 114 at ¶ 10, 116 at ¶ 32.)

39

Given this factual context and the legal framework set out above, we will first look at Plaintiff's claim pursuant to Eighth Amendment protections.  First, Plaintiff's claim fails on the objective seriousness prong of the inquiry.  *See Farmer*, 511 U.S. at 834.  As the Magistrate Judge found, Plaintiff's claim that Defendant Nolte failed to protect him by releasing all the shakedown unit inmates together for recreation time is not objectively sufficiently serious.  (Doc. 147 at 38.)

> The Plaintiff claims he remained in his cell during recreation time.  He has not alleged that any other inmate threatened or harassed him or that he feared them. Moreover, the releasing of six inmates together does not, without more to indicate a sufficiently serious risk of danger, indicate that the plaintiff was exposed to danger. Defendant Nolte purposefully may have not followed a DCP practice or policy, but that alone does not show objectively a high disregard for the safety of the shakedown inmates.

(*Id.*)

Second, Plaintiff's claim fails on the subjective knowledge prong of the inquiry because we do not find any evidence of record establishing Defendant Nolte knew of and disregarded a substantial risk of harm to Plaintiff.  *See Farmer*, 511 U.S. at 837.  To the contrary, the record is void of any evidence directly attributable or amenable to inference that Defendant Nolte knew of any threat to Plaintiff's safety.  *See id.*  As the Magistrate Judge found, Plaintiff "had not complained of a threat from other inmates;

40

indeed he was in the shakedown unit because he feared corrections officers.  No reasonable factfinder could possibly find that defendant Nolte had a definite knowledge of a risk to the plaintiff and inferred that his actions could lead to harm."  (Doc. 147 at 39.)

Based on our analysis of Plaintiff's claim under Eighth Amendment jurisprudence, we can find no violation of his constitutional rights.  However, because a pretrial detainee may be entitled to greater protection than that afforded by the Eighth Amendment, we will now consider Plaintiff's claim pursuant to the conditions of confinement analysis set out in *Bell* and *Hubbard*.[8]

First looking at whether legitimate purposes are served by the complained of condition, the facts of this case and our Eighth Amendment analysis make clear that Defendant Nolte had a legitimate purpose in allowing all shakedown inmates out for recreation together.  *See Hubbard*, 399 F.3d at 158-59.  Defendant Nolte had suspicions of actual or potential wrongdoing and endeavored to learn more, a legitimate function of his responsibility to maintain

---

[8] We recognize that in a case where a pretrial detainee hung himself and the Third Circuit Court of Appeals was confronted with an allegation that a municipal policy or custom was deliberately indifferent to the serious medical needs of suicidal pretrial detainees, Judge Becker applied an analysis which combined the *Bell* test and Eighth Amendment considerations.  *Simmons v. City of Philadelphia*, 947 F.2d 1042, 1068 (3d Cir. 1991) (Sloviter, C.J., concurring in the judgment and filing opinion, Weis, J., filing dissenting opinion).  Because the factual situation and allegations in the case at bar are distinguishable, here we apply a two-stage analysis considering both the Eighth Amendment and Bell tests.

institutional safety.  It is widely recognized that prison official
have a legitimate interest in maintaining security and order.  *See*,
*e.g.*, *id.* at 159-60.

Considering the rational relationship prong of the inquiry,
we find Defendant Nolte's actions were rationally related to his
responsibility of maintaining institutional safety at DCP.  *See id.*
at 158-59.  As discussed above, Defendant Nolte surmised the
inmates in the shakedown unit were plotting some form of conduct
contrary to the interests of the prison.  Further, Defendant Nolte
released the inmates for recreation together at their request to
discern their true intentions.  Upon discovery of two (2) inmates
in breach of the security and safety of the institution, Defendant
Nolte took the reasonable action of securing the inmates and
searching the ceiling area.

Additionally, in light of the deference due prison officials,
no reasonable factfinder could conclude the release of the six (6)
inmates together for the purpose of discerning a potential (and
subsequently verified) breach of security was not rationally
related to the legitimate institutional interests.  *See Hubbard*,
399 F.3d at 159-60.  Defendant Nolte's observation and effective
securing of the inmates upon discovery of the breach further
supports the rational relationship of his actions to the
preservation of security within the institution.  *See id.*

This analysis shows that under the totality of the

42

circumstances no reasonable factfinder could conclude Defendant Nolte's actions were punitive.  Therefore, Plaintiff cannot prevail on his failure to protect claim, and summary judgment for Defendants is appropriate on this issue.

**5.   PLAINTIFF'S FOURTEENTH AMENDMENT DUE PROCESS CLAIMS ON THE BASIS OF THE MISCONDUCTS AGAINST DEFENDANTS NOLTE**

Plaintiff objects to the Report and Recommendation as to Defendant Nolte based on the allegation that the two (2) misconduct reports issued by Defendant Nolte at issue here were not based on sufficient evidence of misconduct.  (Doc. 148 at 23.)  Plaintiff asserts he was sentenced to 120 days in disciplinary lock-in and loss of all good-time credits earned.  (Docs. 81 at ¶ 12, 114 at 24.)

Whether a plaintiff may state a § 1983 claim seeking monetary damages challenging the procedures used in imposing a disciplinary sentence against a convicted prisoner turns on the deprivation alleged. *Heck v. Humphrey*, 512 U.S. 477, 482-83 (1994)(*citing Wolff v. McDonnell*, 418 U.S. 539 (1974)).  In *Heck*, the Supreme Court held a § 1983 plaintiff seeking recovery for damages for unconstitutional conviction, imprisonment, or other harm caused by actions whose unlawfulness would invalidate the conviction or sentence is required to prove the conviction has otherwise been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a writ of *habeus corpus*.  *Id.* at 486-87.

Additionally, the Court stated a district court must consider whether a favorable decision would necessarily implicate the invalidity of the plaintiff's sentence or conviction. *Heck v. Humphrey*, 512 U.S. at 486-87. Upon such a finding, the district court must dismiss the claim unless the plaintiff has shown the previous determination of the invalidity of the sentence or conviction in a manner discussed above. *Id.*

In *Edwards v. Balisok*, 520 U.S. 641, 646-647 (1997), the Supreme Court applied *Heck* to a prisoner's claim that a disciplinary hearing resulting in good-time credits lost was procedurally defective. Specifically, the plaintiff in *Edwards* limited his request for damages for the deprivation of good-time credits without due process and not for the substantive deprivation of the credits. *Id.* The Court observed the plaintiff's assertions that he was completely denied the opportunity to present a defense by calling witnesses' testimony and statements and the deceit and bias of the hearing examiner if established would necessarily implicate the invalidity of his loss of good-time credits. *Id.*

Thus, pursuant to *Heck* and *Edwards*, it is impermissible to bring a § 1983 claim for damages where disciplinary action resulted in loss of good-time credits when a favorable ruling to the plaintiff would necessarily imply the invalidity of the loss of good-time credits. *See Heck*, 512 U.S. at 486-87; *see also Edwards*, 520 U.S. at 646-47. This true even if the plaintiff does not

44

directly challenge the loss of good-time credits. *See Edwards*, 520 U.S. at 646-47.

Here, we find the determination that Defendant Nolte's issuance of the misconduct reports was not based on sufficient evidence would imply the invalidity of Plaintiff's sentence. We note Plaintiff asserts and Defendant concedes Plaintiff lost good-time credit earned as of February 11, 2004. (Docs. 81 at ¶ 12, 114 at 24.) Additionally we note, the hearing board indicated their decision was based on the officer's statement and the text of the officer's misconduct report. (Doc. 117, Exs. C-2, C-7.) Neither Plaintiff nor the record establishes Plaintiff instituted and was successful in a prior *habeus corpus* action in regard to his sentence. Thus, if Plaintiff were successful and the Court determined the evidence relied upon was insufficient to sustain his disciplinary sentence of loss of good-time credit, then the invalidity of his sentence would be impermissibly implied. *Heck*, 512 U.S. at 486-87; *Edwards*, 520 U.S. at 646-47.

We also note Plaintiff attempts to limit the effect of his loss of good-time credits in his Brief in Opposition to Defendants' Motion for Summary Judgment. (Doc. 135 at 18.) Here, Plaintiff asserts he has not proposed in the instant action to recover or litigate the loss of good-time credits. (*Id.*) Plaintiff misconceives the requirements of *Heck* and *Edwards*. The test is not in the relief sought, but whether the invalidity of the sentence is

45

implicated. *Heck*, 512 U.S. at 486-87; *Edwards*, 520 U.S. at 646-47. In this case, a determination of the sufficiency of the evidence would surely implicate the validity of Plaintiff's sentence if his claim were successful for the reasons above.

Given the impermissible nature of Plaintiff's claim, *see Heck*, 512 U.S. at 486-87; *see also Edwards*, 520 U.S. at 646-47., we find summary judgment is appropriate as to this issue.

**6.  PLAINTIFF'S FOURTEENTH AMENDMENT DUE PROCESS CLAIMS ON THE BASIS OF THE MISCONDUCTS AGAINST DEFENDANTS BISHOP**

Plaintiff objects to the Magistrate Judge's conclusion the procedures of the (2) misconduct hearings presided over by Defendant Bishop complied with requirements of due process, *see Wolff*, 418 U.S. at 563-67. (Doc. 148 at 23-26.)  Plaintiff asserts in regard to the deficiencies of the misconduct hearings: 1) he did not waive his rights and was not permitted to present evidence or witnesses on his behalf; 2) he was not presented with the opportunity to have a representative; 3) Defendant Bishop found Plaintiff guilty without other disciplinary board members deliberating or concurring; and 4) he was not properly sentenced because the level of sentence was increased based on an incorrect record of prior convictions. (*Id.*)

We do not reach the issue of whether the misconduct hearings comported with due process requirements as set forth in *Wolff*.  For substantially the same reasons discussed above with regard to

46

Defendant Nolte's issuance of the misconduct reports, we find a judgment in favor of Plaintiff would necessarily implicate the invalidity of his sentence.  Thus, this claim must be dismissed because Plaintiff has not demonstrated the disciplinary sentence was previously invalidated.  *See Heck*, 512 U.S. at 487; *see also Edwards*, 520 U.S. at 646-47.

Here, Plaintiff asserts he was not permitted to present a defense to the charges in that he did not waive his right nor was he afforded the opportunity to present witnesses or evidence on his behalf.  (Doc. 148 at 23-26.)  Additionally, Plaintiff's assertion Defendant Bishop improperly deliberated and found Plaintiff guilty without other board members implicates bias and calls the validity of the sentence into question.  (*Id.*)  As we have previously noted, neither Plaintiff nor the record establishes Plaintiff has brought a successful challenge to his sentence.  Also, Plaintiff's disciplinary sentence included the loss of good-time credit.  (Doc. 117, Exs. C-2, C-7.)  Thus, we find Plaintiff's procedural challenges implicate the invalidity of Plaintiff's sentence and are improper in this § 1983 action.  *See Heck*, 512 U.S. at 487; *see also Edwards*, 520 U.S. at 646-47.

As discussed above, Plaintiff's attempt to limit the effect of the loss of his good-time credits is of no moment.  (Doc. 135 at 18.)  The applicable test is not in the relief sought, but whether the invalidity of the sentence is implicated.  *Heck*, 512 U.S. at

47

487; *Edwards*, 520 U.S. at 646-47.

In this case, Plaintiff's claims are: 1) he did not waive his rights and was not permitted to present evidence or witnesses on his behalf; 2) he was not presented with the opportunity to have a representative; 3) Defendant Bishop found Plaintiff guilty without other disciplinary board members deliberating or concurring; and 4) he was not properly sentenced because the level of sentence was increased based on an incorrect record of prior convictions. Considering these procedural claims and Plaintiff's assertion the evidence relied on for the misconduct reports was insufficient to sustain his disciplinary sentence, a ruling in Plaintiff's favor here would impermissibly implicate the validity of his sentence.

Given the impermissible nature of Plaintiff's claim, *see Heck*, 512 U.S. at 486-87; *see also Edwards*, 520 U.S. at 646-47, we find summary judgment is appropriate as to this issue.

### III.   PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Plaintiff does not object to Magistrate Judge Mannion's recommendation to deny Plaintiff's Motion for Summary Judgment, thus we review the record for clear error as to Plaintiff's motion. *See Cruz v. Chater*, 990 F. Supp. 375, 376-78 (M.D. Pa. 1998).

Plaintiff asserts two claims in his motion: 1) summary judgment is appropriate as to Plaintiff's Fourteenth Amendment Due Process claim against Defendant Bishop; and 2) summary judgment is appropriate as to Plaintiff's Equal Protection claim against

Defendant Bishop.  (Doc. 120 at 10, 19.)

Given our finding that Plaintiff's Fourteenth Amendment claim regarding the constitutionality of the disciplinary hearing and sentence above presented no genuine issues of material fact, we deny Plaintiff's Motion for Summary Judgment (Doc. 111.) on this issue.

Additionally, contrary to Plaintiff's assertion, in this Court's last Memorandum and Order (Doc. 70.) we in fact dismissed Plaintiff's Equal Protection claim stating:

> To the extent that some of Plaintiff's submissions reference . . . equal protection issues, we conclude that Plaintiff has not sufficiently asserted any facts which would substantiate such claims.

(Doc. 70 at 54-55)(citation omitted.))

Based on the above, Plaintiff's Motion for Summary Judgment (Doc. 111) is denied.


IV.    **CONCLUSION**

For the above reasons, we adopt the Magistrate Judge's Report and Recommendation (Doc. 147) with modification and grant Defendants' Motion for Summary Judgment (Doc. 115).  Additionally, we deny Plaintiff's Motion for Summary Judgment (Doc. 111).

Considering our previous Memorandum and Order (Doc. 70) and this Memorandum and Order in combination, Plaintiff's complaint is dismissed as to all claims except one (1).  Plaintiff's excessive

force claim against Defendant Hill will proceed to trial.

An appropriate order follows.


                                    S/Richard P. Conaboy
                                    RICHARD P. CONABOY
                                    United States District Judge

Dated: April 4, 2007

_____

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

BERNARD G. JOHNSON, JR.,            :
                                    :
     Plaintiff,                     :CIVIL ACTION NO. 05-CV-342
                                    :
     v.                             :
                                    :
DOMINICK L. DEROSE, WARDEN; TED     :
BISHOP; KEN NOLTE, CORRECTIONAL     :(JUDGE CONABOY)
OFFICER; JIM HILL, CORRECTIONAL     :(Magistrate Judge Mannion)
OFFICER,                            :
                                    :
     Defendants.                    :

**ORDER**

AND NOW, this 4th day of April 2007, for the above reasons, the following is ordered:

1.  We adopt the Magistrate Judge's Report and Recommendation (Doc. 147) with modification;

2.  Defendants' Motion for Summary Judgment (Doc. 115) is GRANTED;

3.  Plaintiff's Motion for Summary Judgment (Doc. 111) is DENIED;

4.  Plaintiff's Complaint and Amended Complaint (Docs. 1 and 27) are dismissed in their entirety except as to the sole claim of excessive force against Defendant Hill;

5.  This case will proceed to trial only as to Plaintiff's claim of excessive force against Defendant Hill; and

6.   An appropriate case management order setting trial dates
     will be issued at a later date.


                              S/Richard P. Conaboy
                              RICHARD P. CONABOY
                              United States District Judge